**SAMMONS ENTERPRISES, INC., Appellant,**

v.

**Darrell F. MANLEY and Conway Phillips, Appellees.**

**No. 8343.**

Court of Civil Appeals of Texas, Texarkana.

Aug. 17, 1976.

Rehearing Denied Sept. 28, 1976.

Mike Joplin, Strasburger, Price, Kelton, Martin & Unis, Dallas, for appellant.

James E. Coleman, Jr., Carrington, Coleman, Sloman, Johnson & Blumenthal, Dallas, for appellees.

RAY, Justice.

This is a suit to recover money for the sale of stock under stock option re-purchase agreements. Darrell F. Manley and Conway Phillips, appellees (plaintiffs), instituted suit against Sammons Enterprises, Inc., appellant (defendant), to recover the fair market value of 15,000 shares of Sammons Enterprises, Inc. stock. Following a jury verdict finding the price to be $457.00 per share in answer to Special Issue No. 1, the trial court disregarded Special Issue No. 2 and entered judgment for appellees in the total sum of $7,606,608.24 plus interest from date of judgment. The judgment of the trial court will be affirmed.

This is a very complex case in which both parties have been represented by excellent counsel who have presented thorough briefs for consideration by this Court. Appellant

has submitted four points of error for our consideration.

In 1969, Darrell F. Manley, then President of Sammons Enterprises, Inc., and Conway Phillips, then Vice President of Sammons, were issued options by Sammons to purchase at $320.00 per share 10,000 and 5,000 shares, respectively, of the common stock of Sammons. The optionees agreed to remain in the employment of the company for one year, and the options were to last for five years. The agreements also provided to each optionee a "put" giving him the right to sell back to the company all of the shares acquired under exercise of his options at any time within twenty years after the exercise of the option to purchase, at the "fair market value" of such shares of stock at the end of the month of the date of re-sale. This right of re-sale or "put" was granted to Manley and Phillips in order to provide a market for any shares purchased pursuant to qualified stock option agreements because the stock of Sammons was not traded in any public market. The agreements provided that in the event Sammons stock ever had a market on any exchange or over the counter and the "put" was not necessary to provide a market, then the right of re-sale to Sammons would terminate.

The agreements further provided that in the event of the exercise of the "put" by Manley or Phillips, "fair market value" of the shares would be determined by the agreement of the parties, and failing such agreement, by an appraisal. The Trust Departments of the First National Bank in Dallas and the Republic National Bank of Dallas, together with a third appraiser appointed by the Trust Departments of such banks, were named as appraisers.

On June 28, 1973, Manley and Phillips exercised their stock options paying $3,200,-000.00 and $1,600,000.00, respectively, to Sammons and were issued 10,000 shares and 5,000 shares of Sammons Enterprises, Inc. stock. Immediately, Manley and Phillips exercised their right of re-sale of such shares at the then fair market value of such shares as of June 30, 1973, by endorsing such shares in blank and re-assigning them to Sammons. Sammons accepted such shares, cancelled and treated them as treasury shares, and set up a liability on its books for the payment of the purchase price of the shares.

Subsequently, the parties failed to agree on the fair market value of the shares of stock of Sammons. Thereafter, the First National Bank and the Republic National Bank were requested to appraise the shares of stock, but refused to do so without obtaining agreements from Sammons, and from Manley and Phillips amending the stock option agreements and imposing additional requirements as conditions to the appraisement by the banks. Manley did not agree to amend the stock option agreements and no appraisal took place. Phillips indicated that he was willing to agree to all the extra-contractual conditions imposed by the Banks, but the Banks required Manley's agreement also. Suit was filed by Darrell F. Manley on March 8, 1974, and Conway Phillips intervened on July 25, 1974, for damages for breach of contract of Sammons to pay the fair market value for the shares which Sammons had accepted for purchase on June 28, 1973.

Upon the trial of this cause, the jury determined that the fair market value of the shares of stock of Sammons as of June 30, 1973, was $457.00 per share. There has been no appeal by any of the parties relative to the jury's determination of the price of the shares, nor has any appeal been taken relative to the method employed by the jury in determining the fair market value as of June 30, 1973. The jury, in answer to Special Issue No. 2, found that the "actions or words of plaintiffs or their counsel were a proximate cause of the failure of the appraisement to take place." The court disregarded this finding of the jury and entered judgment for appellees in accordance with the jury verdict as to the fair market value of the Sammons stock.

Manley and Phillips terminated their employment with Sammons in the early part of 1972, and subsequently, on June 28, 1973, they simultaneously gave notice of their

exercise of their options, presenting cashier's checks and investment representation letters in connection therewith and immediately exercised their "puts" by endorsing and delivering six stock certificates back as soon as they were received. The controversy revolves around the failure of the appraisal to take place and the subsequent determination by the jury of the fair market value price. Appellant contends that the stock option agreement required appraisal of the stock as a condition precedent to the enforceability of requiring Sammons to pay any purchase price for the 15,000 shares of stock delivered back by Manley and Phillips. Appellant also contends that Special Issue No. 2 was an ultimate issue and not subject to being disregarded by the trial court. Special Issue No. 2 is as follows:

"Do you find from a preponderance of the evidence that the actions or words of Plaintiffs or their counsel were a proximate cause of the failure of the appraisement to take place?

Answer: 'Yes' or 'No'.

ANSWER: Yes

'Proximate cause' means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred; and in order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event."

The paragraphs in the agreements with Manley and Phillips as to determination of the "put" price were as follows:

"6.02 *Determination of, and Payment of Put Price, etc.* The Put Price shall be determined by appraisement unless Optionee and the Company acting through its Board of Directors shall agree on the Put Price. Such appraisement shall be based on the decision of the majority of three competent appraisers, two of whom shall be representatives from the Trust Department of the Republic National Bank of Dallas and the First National Bank in Dallas, respectively, and the third shall be an appraiser appointed by the other two appraisers. The Put Price as determined by such appraisement shall be conclusive and binding upon the Company and Optionee. The Put Price (together with accrued interest at the rate of 6% per annum from the date of exercise of the Put) shall be paid by the Company to Optionee within ten (10) days after issuance by the appraisers of their report setting forth the Put Price. All costs and expenses of the appraisement shall be borne by the Company."

Section 6.01(b) of the Stock Option Agreement provided the guidelines for determining the put price as follows:

"(b) Put Price. The price which the company shall pay to Optionee upon the exercise of the Put shall be an amount in cash equal to the aggregate fair market value of all the shares subject to the Put which shall be determined as of the last day of the calendar month in which the Put was exercised in accordance with the principles of valuation established for Federal estate tax purposes in valuing stock of a closely-held corporation (including those principles set forth in Section 2031(b) IRC."

The posture in which we find this case is that appellees have fully performed their portion of the contract and appellant has performed all of its obligations with the exception of not having paid the purchase price of the stock. Sammons contends that it is not obligated to pay the purchase price until the shares have been appraised and that if the shares have not been or cannot be appraised, then the contract is unenforceable and appellees are not entitled to any relief.

It is undisputed that both parties requested the two banks named in the agreement to appraise the stock. Counsel for one of the appellees questioned whether or not the two banks might not have conflicts of interest since appellant was a sizable depositor in both banks and further that Mr. Charles

A. Sammons was on the Board of Directors of Republic National Bank of Dallas and helped supervise the Trust Department through which the appraisal would be made and the fact that Mr. Peterson, head of the Trust Department of Republic National Bank, was a director of Sammons Enterprises, Inc. This was a legitimate inquiry on the part of counsel, if not both an obligation and duty on his part to protect his client's interests to see that a fair appraisal was performed. However, the banks decided they would not appraise the stock unless appellant and appellees provided them with hold harmless and indemnity agreements. Appellees agreed to the hold harmless portion but would not agree to execute indemnity agreements. The stock option agreements did not require appellees to do anything beyond letting the two banks appraise the stock. The banks ultimately refused to make the appraisal when appellees would go no further than the contractual obligations imposed upon them by the stock option agreements. The stock was in the hands of appellant; the records from which the appraisal was to be determined were in the hands of appellant and the agreement required appellant to pay for the appraisal. Appellees' only obligation, if it can be said to be an obligation, was to allow the two banks to make the appraisal. Appellees' counsel had a duty in representing his clients to make sure that the appraisal was fair, just and unbiased. The two banks owed none of the parties an obligation to appraise the stock since they were not parties to the stock option agreements nor did they know about the agreements until after the agreements had been executed.

Appellant's first two points of error are as follows:

"FIRST POINT: The trial court erred in rendering judgment for Appellees for a total of $7,606,608.24 plus interest from date of judgment since it was undisputed that the appraisement procedure set forth in the contract between the parties had not been carried out and the jury found that it was Plaintiffs who had prevented the appraisement from taking place.

SECOND POINT: The trial court erred in disregarding the jury finding in answer to Special Issue No. 2."

Appellant contends that the appraisal provision of the contracts, Sec. 6.02, supra, represents the essential means of determining the fair market value price and amounts to a condition precedent to any duty to pay. The appellant urges that the trial court not be allowed to substitute its will for this expression of intent of the parties.

The appellees deny that the appraisal mechanism is a condition precedent to the appellant's duty to pay, contend that it is only incidental to the main purpose of the contract, and urge that it be excused because the banks failed to act.

It is the position of the appellees that the appraisal mechanism of Sec. 6.02, supra, is merely an incidental means of implementing the essential manner of calculating the "put" price set out in Sec. 6.01(b). The appellees state the general rule that courts are disinclined to construe stipulations in contracts as conditions precedent unless compelled to do so by plain and unequivocal language of contract. 17A C.J.S. Contracts § 338, p. 322.

■ Whether the appraisal provision is a condition or a covenant is not highly important since impossibility of performance may excuse nonperformance of even a condition precedent if the occurrence of the condition is not a material part of the exchange for the promisor's performance and discharge of the promisor would operate as a forfeiture. *Langdeau v. Pittman*, 337 S.W.2d 343 (Tex.Civ.App. Austin 1960, writ ref'd n. r. e.); 17A C.J.S. Contracts § 463(1) (1963). This same rule was applied in *Lesikar Construction Company v. Acoustex, Inc.*, 509 S.W.2d 877 (Tex.Civ.App. Fort Worth 1974, writ ref'd n. r. e.). Compliance with a contract provision that a subcontractor furnish the general contractor with an affidavit showing that all bills for labor and materials had been paid, was not required as a condition precedent to the subcontractor's recovery of the balance due. The Court cited with approval the Restatement of the

Law of Contracts, Vol. 1, Sec. 302, which provides as follows:

"Excuse of Condition that Involves Forfeiture.

A condition may be excused without other reason if it's requirement (a) will involve extreme forfeiture or penalty, and (b) it's existence or occurrence forms no essential part of the exchange for the promisor's performance."

There the court held that performance of the condition formed no part of the things that the contract called for plaintiff to do for which defendant agreed to pay.

■ The contract before us is essentially one of compensation of corporate executives. The appellees, Manley and Phillips, were given an option to purchase shares from Sammons with the right of re-sale to the corporation. The purchase price was fixed by contract. The re-sale price was to be set by appraisers who were to employ a method of calculation set by the contract. The essence of the contract was the exercise of the option by appellees to purchase, with the right of re-sale to the corporation at the fair market value. The object of the contract was not the appraisal mechanism. It was possible for appellant to foresee at the time the option agreement was executed that the banks and conflicts of interest and might not be able to act, and thus it became the duty of appellant, if it wanted to protect itself through the appraisal process, to have provided for other appraisers in the event one or both banks failed to act. The trial court was correct in not allowing a forfeiture where appraisal was not the object of the contract, but only incidental to arriving at the fair market value of the "put" price. Sec. 6.01 of the agreement provided the guidelines for arriving at the "put" price which appellant could have insisted that the jury follow in arriving at the measure of damages. The appellees had fully performed and nothing else was left for appellant to do but pay the fair market value for the stock when it could not get its named appraisers to act. *Langdeau v. Pittman,* supra; *Lesikar Construction Company v. Acoustex, Inc.,* supra.

■ Appellant cannot rely upon the answer to Special Issue No. 2 which found that appellees were a proximate cause of the failure of the appraisement to take place. The trial court rightfully disregarded the issue because it was not an ultimate issue. The issue itself contained no instructions nor was it tied directly to the obligation of the parties contained in the contract. The appellant did not establish that appellees had a duty to refrain from inquiring as to whether or not the banks could be fair in their appraisal in view of the conflicts of interest, nor was it established that appellees had a duty to agree to provisions for appraisal outside the terms of the contract. While it is true that one cannot ordinarily utilize advantageously his own fault to escape contractual obligations, it was not established that the actions of appellees or their counsel constituted wrongdoing or misconduct as would amount to a breach of duty. The exchange of letters, expressions of doubt, and adherence to the terms of the original contract cannot be said to be the type of misconduct which would bar recovery. The trial court was justified in disregarding such an issue as immaterial to ultimate liability. Tex.R.Civ.P. 279; Tex.R. Civ.P. 301; *C & R Transport, Inc. v. Campbell,* 406 S.W.2d 191 (Tex.1966); *Nealy v. Fidelity Union Life Insurance Company,* 376 S.W.2d 401 (Tex.Civ.App. Dallas 1964, no writ); 4 McDonald's, Texas Civil Procedure, Sec. 17.31(c) (1971).

■ The legitimate exercise of one's lawful right of inquiry, though it may have in fact caused the banks to refuse to appraise the stock, is not the kind of conduct which would render the contract unenforceable with a resulting forfeiture. Appellant's first and second points of error are overruled.

■ Appellant's third point of error insists that appellees did not have clean hands in connection with the transactions involved, having intentionally signed investment letters containing false statements and misrepresentations. The appellant does not assert fraud or misrepresentation as

would invalidate the contract, but rather it is asserted that the making of false statements in writing should prevent the operation of equity in favor of appellees. Appellant's point of error is not well taken since this is a suit for damages for breach of contract and not a suit for equitable relief. Once appellees had fully performed, the only action required of appellant following the failure of the appraisal to occur, was to pay appellees the fair market value of the stock. Failure of appellant to pay the fair market value amounted to a breach of the contract. Appellees sued for the fair market value of the stock which was a measure of damages. Since this was an action at law for damages for breach of contract, appellant's point of error is without merit and is therefore overruled. The equitable remedy of specific performance is not ordinarily available when the complaining party can be fully compensated through the legal remedy of damages. 52 Tex.Jur.2d, Specific Performance, Sec. 22, p. 542 (1964); 81 C.J.S. Specific Performance § 80, p. 590 (1953).

Appellant's claim that appellees lacked "clean hands" is without support in the evidence since it is referenced to an affidavit and certain interrogatories which were not introduced into evidence. It is fundamental that "in a jury trial or trial to the court, answers to interrogatories made pursuant to Rule 168, Texas Rules of Civil Procedure must be introduced into evidence in order to be of any probative value." *Richards v. Boettcher*, 518 S.W.2d 286, 288 (Tex.Civ.App. Texarkana 1974, writ ref'd n. r. e.). The affidavit, even if it had been offered into evidence would have been inadmissible as hearsay, and would have been without probative force. *Halliday v. Lambright*, 29 Tex.Civ.App. 226, 68 S.W. 712 (1902, no writ); *Ward v. National Benev. Soc.*, 155 S.W.2d 994 (Tex.Civ.App. Galveston 1941, no writ). Appellant's third point of error is overruled. Appellant's fourth point of error is overruled for the same reasons and for the additional reason that it was not properly preserved by an assignment of error in the trial court. Tex.R.

Civ.P. 374; *Smith v. Brock*, 514 S.W.2d 140 (Tex.Civ.App. Texarkana 1974, no writ).

The judgment of the trial court is affirmed.