IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-10726
_____

DANIEL W. VAREL,

                              Plaintiff-Appellant,

                    versus

BANC ONE CAPITAL PARTNERS,
INC., Formerly known as MVenture Corp., ET AL.,

                              Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

(June 12, 1995)

Before REYNALDO G. GARZA, HIGGINBOTHAM, and PARKER, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

The founder of a drilling bits company claims a bank sold equity securities of his company without respecting his contractual right of first refusal. Finding that his company failed to perform a condition precedent to his right of first refusal, the district court awarded defendants summary judgment. We reverse and remand.


                              I.

In 1986, Varel Manufacturing Company was in default on certain loan agreements. To restructure its debt, Varel Manufacturing and its lenders -- MBank Dallas and the FDIC -- agreed to an "Amended,

Restated and Consolidated Term Loan Agreement" on September 30, 1986. The 1986 agreement reduced Varel Manufacturing's debt by $5 million in exchange for certain debt and equity securities that Varel Manufacturing issued. The agreement also gave Varel Manufacturing a right of first refusal, which is at the center of this lawsuit.

Banc One, Texas, N.A., acquired the equity securities held by one of the two lenders, MBank, through a series of unchallenged transactions. In the autumn of 1992, S.N. Phelps & Co. offered to purchase the equity securities held by Banc One. Banc One notified the other lender, the FDIC, of the offer. The FDIC declined to purchase the securities and Banc One then sold them to Phelps in November 1992. Phelps later sold them to Commonwealth Oil Refining Company, Inc.

Varel Manufacturing's principal shareholder and founder, Daniel W. Varel, sued in Texas state court, alleging that Banc One's sale of the equity securities to Phelps without first inviting Varel to purchase them at Phelps' offered price, breached his contractual right of first refusal under the loan agreement. He sought the right to buy back the equity securities formerly held by Banc One at the price Phelps paid for them. The FDIC removed to federal court.

The district court granted defendants' motions for summary judgment. It held that Varel Manufacturing was in default on the loan agreement because it dissolved V.A.C.O., a Varel subsidiary and one of the guarantors of the loan, without the permission of

2

the lenders, as required under the loan agreement, and that Varel's right of first refusal was conditioned on its not being in default. The district court did not reach defendants' alternative argument that Varel's right of first refusal was triggered only by an offer to purchase the securities held by both entities and not by an offer to purchase all securities held by one.

We are not persuaded that the condition is enforceable on these facts or that the summary judgment can be sustained on the alternative grounds. We vacate the summary judgment, and remand.

## II.

Under the contract, Varel was entitled to exercise his right of first refusal only "if no Default or Event of Default has occurred and is continuing under this Agreement." Varel does not dispute that dissolving V.A.C.O. without written notice to the lenders and their written consent was an event of default.

Varel argues that his non-performance of this condition precedent should be excused. Texas courts disfavor forfeitures. See, e.g., Huff v. Speer, 554 S.W.2d 259, 261 (Tex. Civ. App.-- Houston [1st Dist.] 1977, writ ref'd n.r.e.). Texas courts excuse non-performance of a condition precedent if the condition's requirement "'(a) will involve extreme forfeiture or penalty, and (b) its existence or occurrence forms no essential part of the exchange for the promisor's performance.'" Lesikar Constr. Co. v. Acoustex, Inc., 509 S.W.2d 877, 881 (Tex. Civ. App.--Fort Worth 1974, writ ref'd n.r.e.) (quoting Restatement (First) of Contracts

3

§ 302); see also Restatement (Second) of Contracts § 229 (replacing First Restatement's § 302) cmt. b (1981) ("In determining whether the forfeiture is 'disproportionate,' a court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture."). Texas courts construing this test have focused on its second part, examining whether performing the condition precedent was the object of the contract or merely incidental to it, and whether not performing it caused any loss. See Huff, 554 S.W.2d at 261 (plaintiffs' failure to comply with condition precedent by tendering pledged stock to the court registry instead of to the debtor excused under Restatement § 302, where non-compliance caused defendants no loss); Sammons Enterprises, Inc. v. Manley, 540 S.W.2d 751, 756 (Tex. Civ. App.--Texarkana 1976, writ ref'd n.r.e.) (non-occurrence of appraisal mechanism, a condition precedent under the contract, excused where the appraisal "was not the object of the contract, but [was] only incidental to arriving at the fair market value of the 'put' price."). We follow the Texas courts' lead here.

If the default is unexcused, the penalty facing Varel is extreme when measured against the purpose of the default provision. Varel, the eighty-two-year-old founder of Varel Manufacturing, has always wished to keep control of the company within the family. He argues that without his right of first refusal -- that is, without

4

his right to pay Phelps' price for the equity securities Banc One once held -- regaining control over his company is placed beyond his financial grasp.

It is true that Varel's potential forfeiture is not unlimited. He does not risk forfeiting any of his rights in the remainder of the contract. On the other hand, his failure to obtain consent to the dissolution cannot on these facts bear the freight of forfeiture.

The continued existence of V.A.C.O. was not an essential part of the performance the lenders bargained for. V.A.C.O. was practically useless as a guarantor of the loan agreement. Varel created this shell corporation to take advantage of certain tax benefits which evaporated with a change in the tax law in 1985. We are told that had V.A.C.O. not been dissolved, it would have cost the company approximately $1.6 million. V.A.C.O. had less than $3,000 in cash and some outstanding loans made by V.A.C.O. to Varel. The other three guarantors of the loan had assets. On these facts, consent to the dissolution could not have been properly withheld. The lenders paid no attention to the dissolution of V.A.C.O. until years later, when their lawyers were searching for a defense to Varel's lawsuit.

In sum, Varel's dissolution of V.A.C.O. without written notice to the lenders and without their written consent was at best a technical default under the loan agreement and was legally excusable. We do not reach the claims of procedural error urged by Varel, but do now reach defendants' alternative argument.

III.

Defendants argue that under Section 5.06 of the Loan Agreement, Varel's right of first refusal is not triggered unless both lenders wish to accept offers to sell their equity securities. Defendants urge us to affirm the district court's summary judgment order on this ground, but we conclude that the answer depends on undetermined questions of fact.

The text of Section 5.06 is hopelessly ambiguous. We reprint it here in full, adding explanatory notes and indentation for clarity. We emphasize the contested words:

[I. VAREL'S RIGHT OF FIRST REFUSAL]

[1] In the event that MVenture _or_ FDIC receives _an offer_ from a third party to purchase _all_ of the Equity Securities then held by _them_, which MVenture _and_ FDIC desire to accept, if no Default or Event of Default has occurred and is continuing under this Agreement, MVenture _and_ FDIC shall first give written notice of such offer to Daniel W. Varel, and Daniel W. Varel will have sixty (60) days from the date such notice is sent by such _holders_ in which to purchase the the [sic] Equity Securities _to which such offer relates_, for a price equal to the price contained in such offer, and upon such other terms and conditions contained in such offer.

[2] In the event Daniel W. Varel does not purchase the Equity Securities within sixty (60) days from the date of such notice, the _holders_ thereof may sell the Equity Securities to the third party for the same consideration and upon same terms and conditions, as are contained in its offer, and the Right of First Refusal provided in this Section 5.06 to David [sic] W. Varel shall expire upon such sale.

[3] The Right of First Refusal provided in this Section 5.06 shall not apply or extend to the sale of the Equity Securities, or any portion thereof, to either Lender or any affiliate or subsidiary of either Lender.

[4] In the event that MVenture <u>or</u> FDIC receives an offer from a third party (other than Daniel W. Varel) to purchase all of the Equity Securities held by such holder, which such holder (the "Offeror") desires to accept, the Offeror shall first give written notice to the other holder of the Equity Securities (the "Offeree") of the Offeror's desire to to [sic] sell the Equity Securities then held by the Offeror to the Offeree for the same consideration, and upon the same terms and conditions, as are contained in such offer.

[5] The Offeree shall have seventy-five (75) days from the day such notice is received by the Offeree in which to purchase the Equity Securities then held by the Offeror (<u>so long as Daniel W. Varel does not timely exercise any right of first refusal he may have with respect to all of the Equity Securities</u>) for the same consideration, and upon the same terms and conditions, as are contained in Offeror's notice.

Both parties make plausible arguments resting on the language of Section 5.06. Varel's view -- that his right of first refusal is triggered by a single offer to a single lender that the lender wishes to accept -- finds support in the opening words of Section 5.06's first sentence, which state that the section applies "[i]n the event that MVenture <u>or</u> FDIC receives <u>an offer</u>."

However, a third of the way into the first sentence, the text swaps the use of the singular for plurals and trades disjunctives for conjunctives, apparently contemplating that Varel's right of first refusal is not triggered until both lenders have received offers. It states that Varel's right of first refusal is triggered when a third party offers "to purchase <u>all</u> of the Equity Securities then held by <u>them</u>, which MVenture <u>and</u> FDIC desire to accept." "MVenture <u>and</u> FDIC" shall then notify Varel of the offer and may accept the offer if, after 60 days after notification "by such

7

holders," Varel has not exercised his right of first refusal. Section 5.06's second sentence similarly states that the "holders" could sell to a third party if Varel does not exercise his right.

Varel tries to harmonize this middle third of the first sentence with the first third of the sentence. He argues that the plural pronoun "them" means the singular pronoun "it," and that the drafter simply committed the common grammatical gaffe of referring to a singular corporation with a plural pronoun.

Varel also attempts to reconcile the second third of the sentence's use of the words "and" with the first third of the sentence's use of the word "or" by insisting that the drafter understood "and" and "or" to be interchangeable. Varel cites Texas cases holding that the word "and" can mean "either or both." See Aerospatiale Helicopter Corp. v. Universal Health Servs., Inc., 778 S.W.2d 492, 502 (Tex. App. -- Dallas 1989, writ denied), cert. denied, 498 U.S. 854 (1990); Neighborhood Comm. on Lead Pollution v. Board of Adjustment, 728 S.W.2d 64, 68 (Tex. App. -- Dallas 1987, writ ref'd n.r.e.).

Defendants concede that under Texas law, "and" can mean "or," but argue that in this case it does not. Defendants argue that the drafter understood the difference between the disjunctive and the conjunctive. The drafter properly uses the disjunctive in Section 5.06's description of each lender's right of first refusal. In the fourth sentence of Section 5.06, the drafter provides that "[i]n the event that MVenture or FDIC receives" an offer, that lender must extend that offer to its co-lender. The drafter knew how to

8

use the disjunctive, defendants argue, and the fact that the drafter used the conjunctive in describing Varel's right of first refusal indicates that the drafter intended Varel's right to be triggered only when both lenders, not just a single lender, desired to accept an outside offer.

The final third of the first sentence of Section 5.06 changes tone again, now favoring Varel. The final third states that Varel has the right to purchase "the Equity Securities to which such offer relates" at the offered price. If the drafter had contemplated that Varel's right was triggered only by an offer to buy all of the equity securities, not just those held by one lender, the language here would be superfluous.

The final textual tiff is the parenthetical in the final sentence of Section 5.06. The sentence reads as follows:

> The Offeree shall have seventy-five (75) days from the day such notice is received by the Offeree in which to purchase the Equity Securities then held by the Offeror (so long as Daniel W. Varel does not timely exercise any right of first refusal he may have with respect to all of the Equity Securities) for the same consideration, and upon the same terms and conditions, as are contained in Offeror's notice.

This highlighted parenthetical could plausibly support either of the parties' interpretations. Varel argues that the word "all" favors his reading. The word "all" refers only to the equity securities held by one -- not both -- of the lenders. Specifically, "all" here refers to the equity securities held by the lender who has been approached by a third party wishing to buy. Varel points to this usage in reply to defendants' argument that the word "all" in the middle third of Section 5.06's first sentence

9

refers to the equity securities of both lenders.  Since the word "all" in this parenthetical apparently refers to the equity securities held by only one of the lenders, Varel has a strong argument that the word "all" in the first sentence, like the word "all" in this parenthetical, refers to only the equity securities held by one, not both, of the lenders.

Defendants challenge the premise of this argument.  The parenthetical, they argue, applies only when both of Section 5.06's rights of first refusal -- the right of Varel, and the right of the lenders -- are triggered at once.  Both rights of first refusal are triggered if both lenders wish to sell to a third party at the same time.  When both lenders wish to sell, the parenthetical's word "all" refers to the equity securities of both lenders, not just one.

To bolster their textual arguments, both parties cite surrounding circumstances.  See Sun Oil Co. (Delaware) v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981) ("surrounding circumstances" may be used to interpret an ambiguous contract).  Defendants note that the lenders wanted to guarantee their power to take control of Varel Manufacturing should it make a monetary default.  They sought to guarantee that right through Loan Agreement provisions ensuring that in the event of a monetary default, the lenders would control between them at least 51 percent of the issued and outstanding voting capital stock of Varel Manufacturing.  Defendants argue that lenders so concerned with the ability to gain control over Varel Manufacturing would not have "purposefully dismantled what they had

10

so painstakingly wrought" by agreeing to Section 5.06 as interpreted by Varel. If Varel had a right of first refusal when even one lender sold its equity securities, Varel would have the power to regain majority control over the stock, forcing the remaining lender into a minority position. Varel, by contrast, notes that the lenders' concern for gaining control in the event of a monetary default was no greater than his own concern for keeping control of the company within his family.

In short, we find both arguments plausible and the text ambiguous. "When a provision in a contract is ambiguous . . . we must take into account the parties' understanding of it." Hoyt R. Matise Co. v. Zurn, 754 F.2d 560, 564 n.3 (5th Cir. 1985) (examining parties' testimony regarding their understanding of the contract to determine the meaning of ambiguous terms, in Texas diversity case); Sun Oil, 626 S.W.2d at 732 (Texas courts may consider "parties' interpretation" to inform meaning of ambiguous contracts).

Varel's depositions of representatives of the FDIC and of MBank indicate that both the FDIC and MBank intended Varel's right of first refusal to be triggered when even only one lender desired to accept an outside offer. An MBank officer who handled the Loan Agreement stated in deposition that when Section 5.06 was drafted, she understood it to give Varel a right of first refusal "if either or -- or both [lenders] collectively . . . were given an offer to sell the debt or the securities." Similarly, a former FDIC officer stated in deposition that Varel's right of first refusal was

11

intended to be triggered "both . . . where a third party made an offer for both FDIC and MVenture's equity as well as for either FDIC or MVenture's equity. . . . It would have been inconsistent with . . . the FDIC's intent and my view of this section for a third party to make an offer, for that offer to be accepted by one of the lenders, and for that lender to sell their equity to the third party without first providing a right of first refusal pursuant to this section to Dan Varel."  This same officer understood the word "them" in the first sentence of Section 5.06 to mean the "FDIC or MVenture."

We leave the veracity and force of this testimony to the district court.  See <u>Hanssen v. Qantas Airways Ltd.</u>, 904 F.2d 267 (5th Cir. 1990) (reversing summary judgment because contract was ambiguous and remanding for consideration at trial of extrinsic evidence).


IV.

Finally, defendants argue that the <u>D'Oench, Duhme</u> doctrine[1] precludes Varel's construction of the contract.  We disagree.

Varel, defendants say, argues that Section 5.06 is "a mutual mistake [that] does not reflect the parties' actual agreement. . . . [and that] the 'real deal' was a prior, apparently oral, agreement which Varel suggests was lost in the shuffle during the drafting process."  Defendants assert that Varel is seeking to enforce an unrecorded side agreement against the FDIC, in violation

---

[1]  <u>D'Oench, Duhme & Co. v. FDIC</u>, 315 U.S. 447 (1942).

12

of the D'Oench, Duhme doctrine.  See Bowen v. FDIC, 915 F.2d 1013, 1015-16 (5th Cir. 1990).  We disagree.  The meaning of an ambiguous contract provision is at issue, not the enforceability of a secret agreement.

In the same vein, defendants argue that Varel's attempt to introduce parol evidence also violates the D'Oench, Duhme doctrine: "[c]all it what you may, if it is outside the written records of the bank (most notably the Loan Agreement itself), and would change in any way the interpretation of the Loan Agreement," D'Oench, Duhme bars it.  This assertion equates the D'Oench, Duhme doctrine with the parol evidence rule and "takes the doctrine too far." FDIC v. Waggoner, 999 F.2d 826, 828 (5th Cir. 1993).

V.

We must disagree with the district court's reasons for granting summary judgment, and because we cannot affirm on alternate grounds, we REVERSE the district court's summary judgment order and REMAND for further proceedings.

REVERSED and REMANDED.

13