Affirmed in Part; Reversed and Remanded in Part; and Opinion filed
October 30, 2007








Affirmed in
Part; Reversed and Remanded in
Part; and Opinion filed October 30, 2007.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00703-CV

____________

 

DESIGN ELECTRIC, Appellant

 

V.

 

CADENCE MCSHANE CORPORATION, Appellee

 



 

On Appeal from the 281st
District Court

Harris County, Texas

Trial Court Cause No. 2004-18475

 



 

O P I N I O N








Following a bench trial in this construction contract case,
the trial court (1) rendered judgment for appellee, Cadence McShane Corporation
(ACadence@), on its claim
for breach of contract against appellant, Design Electric (ADesign@), (2) sustained
all of Cadence=s affirmative defenses to Design=s claims against
Cadence, and (3) rendered judgment in favor of Cadence on all of Design=s claims against
Cadence and all of Design=s affirmative defenses to Cadence=s claims.  The
court adjudged Cadence was entitled to receive a $300,000 credit from Design,[1]
and Design was entitled to receive $240,000 in retainage from Cadence. 
Determining Cadence was the prevailing party and was entitled to attorneys= fees of
$286,945.50, the trial court Aadjudged that after all just and lawful
offsets,@ Cadence was
entitled to a net award of $15,183.50[2]
with post-judgment interest and additional attorneys= fees in the event
of an unsuccessful appeal by Design.

We conclude no evidence supports several of the trial court=s findings of fact
necessary to support some portions of its judgment and its determination
Cadence was the prevailing party.  We therefore affirm, in part, and reverse
and remand, in part.

Factual and Procedural Background

In February 2000,
Premier Towers, L.P., contracted with Cadence to act as general contractor for
a condominium project in Houston (Athe Project@).[3] 
The Project was designed to include a service entrance buswayCequipment that
brings electricity from a transformer vault into the switchgear, which then
distributes electricity through the building. The Project=s electrical
engineer originally specified a current limiting, high reactance busway capable
of reducing 245,000 incoming amperes to 200,000 amperes.  Such a busway must be
custom built and is more expensive than a standard I-line busway.








Design was the successful bidder on the Project=s core electrical
work, which included the service entrance busway, and Design and Cadence
executed a subcontract on August 15, 2000, with an effective date of June 27, 2000. 
Design=s bid of
$1,441,203 for the core electrical work was based, in part, on a quote from
Design=s supplier, Rexel
Summers (ARexel@).[4] 
Rexel=s quote of
$476,000 was based on a bill of materials provided by Design and derived from
the then-existing plans and specifications.  The bill of materials included
sixty feet of current limiting, high reactance busway.

At some point, Design told Cadence that, if the busway were
changed to eliminate the requirement of a current limiting, high reactance
busway, the savings would be in the range of $250,000B$300,000 to
$500,000.[5] 
Based on talks with manufacturers, the Project=s electrical
engineer believed the savings would be in the magnitude of $400,000 and changed
the service busway requirements, eliminating the current limiting, high
reactance busway.[6] 
A main reason for the change was to save money.








Under the subcontract, full credit was expected for any
deleted work and, AWhen quoting change proposals,
Subcontractor shall provide a detailed, itemized breakdown of cost in support
of change proposal [sic], whether additive or deductive.  A
single lump sum price without any description, itemization or explanation will
not be accepted.@  On August 18, 2000, Rexel issued Design
a $128,000 deductive credit from the $476,000 specified in its original quote. 
Several weeks later, Design orally advised Cadence the credit resulting from
the changed busway specification would be $120,000.  Cadence and Design
disputed the amount of the credit for two years, with Cadence repeatedly asking
Design for information.

On December 22, 2000, Cadence and Premier executed a
contract modification setting the guaranteed minimum price (AGMP@) for the
Project.  Cadence and Premier included a $300,000 reduction to the GMP for the
savings associated with the less expensive busway.  Before signing the
modification, Cadence did not request that Design provide any firm or written
pricing representation for the savings resulting from the revised busway
specification, and no agreement existed between Cadence and Design for any
particular amount of savings, credit, or cost reduction resulting from the
busway change.

By January 2002, the busway had been installed.  On October
6, 2002, Cadence issued a change order which modified the subcontract by
including a $300,000 credit for the less expensive busway.  From that time,
Design noted its dispute on change orders reflecting the $300,000 credit, but
Design continued its work on the Project and continued submitting payment
requisitions.  

In January 2003, Design provided Cadence with documents
from Rexel indicating a January 24, 2000 Abase bid@ of  $476,000 and
an August 18, 2000 Adeduct@ of $128,000 Afor current
limiting buss duct change.@  In February 2003, Design included a
$120,000 buss duct credit on an invoice to Cadence.[7] 
Neither the documents nor the invoice separated the components, if any, of the
credit.

The Project was substantially complete by early fall 2003. 
On October 1, 2003, Cadence certified to Premier that, except for $100,000, all
remaining amounts under the general contract were due and payable.[8]








As amended by authorized change orders, the final amount of
the Cadence/Design subcontract was $4,065,303.[9] 
In addition, Design contended it had performed $43,496.72 of  work not
reflected by change orders.[10] 
Cadence conceded additional changes amounting to $35,250.[11] 
Over the period of the subcontract, Cadence paid Design a total of $3,588,791.[12]
During 2003 and 2004, Design filed six lien affidavits against the Project.  In
its supporting affidavits, Design claimed nonpayment of amounts owed it by
Cadence.  In late 2003 or early 2004, Premier first learned Cadence was
withholding contract funds from Design and that Cadence disputed the amount of
credit for the busway. 

Premier made its final payment to Cadence on March 24,
2004.  The payment included all of the general contract amount, less $240,000
in retainage.[13] 
Under an agreement Premier and Cadence had executed the previous month, Premier
was to withhold $240,000 Afor the Design Electric lien,@ paying the
$240,000 on or before the earlier of the following: (a) ADesign Electric
executes a full and final release of the project@; (b) A[t]he statute of
limitations has expired on Design Electric=s bond claims
without Design Electric filing suit against the owner@; (c) A[t]he matter is
resolved by settlement.@








On April 8, 2004, Design sued Cadence for breach of
contract, substantial completion, quantum meruit, violations of the Prompt
Payment Act,[14]
foreclosure of lien, and attorneys= fees.  In
subsequent petitions, Design added claims for breach of construction trust and
for an accounting, and eliminated lien foreclosure.[15] 
In its answer, Cadence alleged failure of conditions precedent and asserted
numerous affirmative defenses including  waiver, estoppel, fraud, good faith
dispute, offset, and unclean hands.  Cadence also counterclaimed against
Design, suing for breach of contract, fraud, unjust enrichment, invalid liens,
and attorneys= fees. 

Following a four‑day bench trial beginning on
September 13, 2005, the parties submitted written closing arguments.  In its
argument, Cadence argued that deletion of the current limiting, high reactance
busway reduced the contract amount by $690,547.83.

The trial court entered judgment, and on May 15, 2006,
entered a modified final judgment.  The trial court (1) rendered judgment for
Cadence on its claim for breach of contract against Design, (2) sustained all
of Cadence=s affirmative defenses to Design=s claims, and (3)
rendered judgment in favor of Cadence on all Design=s claims against
Cadence and all Design=s affirmative defenses to Cadence=s claims.  The
trial court adjudged Cadence was entitled to receive a $300,000 credit from
Design, and Design was entitled to receive $240,000 in retainage from Cadence. 
Concluding Cadence was the prevailing party and was entitled to attorneys= fees of
$286,945.50, the trial court Aadjudged that after all just and lawful
offsets,@ Cadence was
entitled to a net award of $15,183.50 with post-judgment interest and
additional attorneys= fees in the event of an unsuccessful
appeal by Design.  The trial court subsequently entered fifty-three findings of
fact and seventeen conclusions of law.

 








Issues Presented and Standards of Review

The real dispute in this appeal is over the trial court=s award of
attorneys= fees to Cadence and its denial of attorneys= fees to Design. 
Resolution of this dispute rests, in part, on a determination of who was the
prevailing party below.  The matter is complicated by the fact that the trial
court=s net award to
Cadence reflects an award to Design of between $271,762 and $511,762 before the
offset for Cadence=s attorneys= fees.[16] 
Yet, the trial court found for Cadence on its breach of contract claim against
Design and on its affirmative defenses to all of Design=s claims and
against Design on all of its claims.  So, on appeal as below, a simple
controversy has grown hydra-like into a multi-headed beast.[17]

Design presents the following five issues for review: (1)
whether Design proved, as a matter of law, its Prompt Payment Act claim against
Cadence for withholding $271,762 in excess of the maximum amount involved in a
bona fide dispute; (2) whether Design proved, as a matter of law, its breach of
contract claim against Cadence, given the trial court=s finding Cadence
still owed Design $511,762 under the subcontract; (3) whether the trial court
erred in awarding Cadence its attorneys= fees and in
denying Design its attorneys= fees; (4) whether there was legally or
factually sufficient evidence to support the trial court=s finding Cadence
was entitled to a $300,000 credit; and (5) whether there was legally or
factually sufficient evidence to support the trial court=s findings Cadence
had established its defenses of waiver, estoppel, and unclean hands.  Design,
however, addresses these issues in nine arguments.[18]








In issues one and two, then, Design challenges the legal
sufficiency of the evidence to support selected findings of fact.  In issues
four and five, Design challenges the legal and factual sufficiency of the
evidence to support selected findings of fact.

Findings of fact in a bench trial have the same force and dignity as a jury=s verdict on jury
questions.  Arrellano v. State Farm Fire and Cas. Co., 191 S.W.3d 852,
855B56 (Tex. App.CHouston [14th
Dist.] 2006, no pet.).  We conduct a legal and factual sufficiency review of a trial court=s findings by the
same standards we apply when reviewing evidence supporting a jury=s answer.  Id.
at 856.  If a party attacks the legal sufficiency of the evidence supporting an
adverse finding on an issue on which it did not have the burden of proof, the
party must demonstrate on appeal no evidence supports the adverse finding.  Id. 
When a party attacks the legal sufficiency of an adverse finding on which it
had the burden of proof, it must demonstrate the evidence establishes, as a
matter of law, all vital facts in support of the issue.  Dow Chem. Co. v.
Francis, 46 S.W.3d 237, 241 (Tex. 2001).  We first examine the record for
evidence supporting the finding, while ignoring all evidence to the contrary.  Id. 
If no evidence supports the finding, we then examine the entire record to determine
whether the contrary proposition is established as a matter of law.  Id. 
We may sustain the issue only if the contrary proposition is conclusively
established.  Id.  When a party attacks the factual sufficiency of a
finding, we set aside the finding only if it is so contrary to the overwhelming
weight and preponderance of the evidence that it is clearly wrong and
manifestly unjust.  Id. at 242.








In issue three, Design challenges the trial court=s award of
attorneys= fees to Cadence and its failure to award attorneys= fees to Design. 
The availability of attorneys= fees under a particular statute is a
question of law for the court.  Holland v. Wal‑Mart Stores, Inc.,
1 S.W.3d 91, 94 (Tex. 1999).  Under Texas Civil Practice and Remedies section
38.001, the award of reasonable attorneys= fees to the prevailing
party in a breach of contract case is mandatory if there is proof of the
reasonableness of the fees.  Budd v. Gay, 846 S.W.2d 521, 524 (Tex. App.CHouston [14th
Dist.] 1993, no writ); see Tex.
Civ. Prac. & Rem. Code Ann. ' 38.001 (Vernon
1997).  The amount of the award, however, lies within the discretion of the
court.  Budd, 846 S.W.2d at 524.

Under the Prompt Payment Act, Athe court may
award costs and reasonable attorneys= fees as the court
determines equitable and just.@  Tex.
Prop. Code Ann. ' 28.005 (Vernon 2000).  Such an award is
discretionary.  See Bocquet v. Herring, 972 S.W.2d 19, 20 (Tex.
1998) (stating statutes providing Athe court >may= award attorney
fees@ afford trial
court a measure of discretion in deciding whether to award attorney fees).  A
trial court abuses its discretion if it acts in an arbitrary or unreasonable
manner without reference to any guiding rules or principles.  Downer v.
Aquamarine Operators, Inc., 701 S.W.2d 238, 241B42 (Tex. 1985).

Analysis

Issues Four and Issue Five
(partial):  Sufficiency of the Evidence to Support a Busway Credit of $300,000

 








In issue four, Design contends the evidence was legally and
factually insufficient to establish $300,000 as the amount of the busway
credit.  Design argues that the only evidence showed the credit should have
been $120,000 or $128,000.[19] 
As part of issue five, Design argues the evidence was legally and factually
insufficient to support the trial court=s finding Cadence
established its affirmative defense of estoppel and Cadence substantially
relied to its detriment on Design=s representations
the service busway cost $10,000 per linear foot and Design would return savings
of at least $300,000 if the high reactance busway were deleted.

Although the amount of the busway credit is not the main
issue, it pervades the calculations in this case.  We therefore begin with
these issues.  We conclude the evidence was legally and factually sufficient to
support the trial court=s finding Design is estopped from claiming
a busway credit in an amount less than $300,000.[20]

For Cadence to prevail on its affirmative defense that
Design is equitably estopped from asserting its claim regarding the amount of
the busway credit, Cadence was required to produce evidence of the following:
(1) a false representation or concealment of material facts, (2) made with
actual or constructive knowledge of those facts, (3) with the intention that
the representation should be acted on, (4) the representation was made to a
party who was without knowledge or means of obtaining knowledge of the real
facts, and (5) the party to whom the representation was made detrimentally
relied on the representations.  See Johnson & Higgins of Tex., Inc., v.
Kenneco Energy, Inc., 962 S.W.2d 507, 515B16 (Tex. 1998).[21] 
Cadence produced the following evidence:








$        At some point, Design told Cadence that, if
the busway were changed to eliminate the requirement of a current limiting,
high reactance busway, the savings would be in the range of $250,000B$300,000 to $500,000;

$        Premier would not have eliminated the
requirement of a current limiting, high reactance busway and relinquished
future capacity if the savings were only $120,000;

$        As of August 18, 2000, Design had
information from Rexel indicating a busway credit of only $128,000;

$        Cadence repeatedly asked Design to provide
documentation of the difference in price between the current limiting, high
reactance busway that was used in the subcontract price and the cost of the
less expensive busway Design actually installed; 

$        Design repeatedly represented to Cadence it
would provide the proper documentation, but it did not provide Cadence with
anything in writing until January 2003;

$        Distributors provide lot, as opposed to
itemized, pricing because they must check several different options to secure
pricing and put their own price together; they then Ahold that close@ until the project is awarded or
narrowed down;

$        Deon Snider recalled a discussion in which
comments were made about Cadence trading savings on this project for losses on
an Austin project;[22]

$        Design had done Aa wonderful job documenting
everything else in the project, but when it got down to this single issue, all
[Cadence] got was a stiff arm@;

$        Relying on Design=s representations that the cost
reduction resulting from the use of a standard busway would be in the range of
$250,000B300,000 to $500,000, Premier and
Cadence used a conservative figure of $300,000 for the credit in the Project=s budget and in the guaranteed
maximum price contract; 








$        To cover its $300,000 exposure with Premier
under the Project=s guaranteed maximum price, Cadence
issued a change order of $300,000 reflecting the savings from the use of the
less expensive busway, based on Design=s prior representations and Design=s failure to provide cost
documentation. 

 

Thus, the evidence established (1) Design, at a minimum,
concealed Rexel=s quotation of a busway credit of $120,000
after it had previously represented the savings would be as much as $500,000;
(2) Design necessarily had knowledge of those facts; and (3) in setting the GMP
for the project, Cadence detrimentally relied on the representation of a
$250,000B$300,000 to
$500,000 savings.  Additionally, the importance of savings to Premier, the
project owner, supported the element that Design intended Cadence act on its
representation by conveying the information to Premier.  Finally, the
distributors= practice of Aholding close@ to their pricing
and Cadence=s repeated requests for documentation from Design
supported the element that Cadence was without knowledge or means of obtaining
Rexel=s pricing for the
original busway or the credit.

Accordingly, we conclude the evidence was legally and
factually sufficient to support the trial court=s finding that
Design is estopped from claiming a busway credit of less than $300,000.  We
overrule Design=s fourth issue and that portion of its
fifth issue challenging the trial court=s finding of
estoppel against Design.

Issue
One:  Prompt Payment Act Claim








Issue and overview of arguments.  In issue one,
Design challenges the trial court=s finding that
Design=s Prompt Payment
Act claim was defeated Abecause at all times, there was a good
faith dispute regarding the amount, if any, owed to Design, and because of
Design=s prior breach of
contract.@[23]  Design contends
it proved its Prompt Payment Act claim as a matter of law and requests we
render judgment for Design and award it a specified amount of interest based on
Cadence=s allegedly
improper withholding of $271,762.  Cadence responds that Design=s Prompt Payment
Act claim fails because (1) Design was not entitled to payment because it did
not meet two conditions precedent, and (2) a good faith dispute existed as to
the entire $811,762 Cadence withheld.  We agree Design proved its Prompt
Payment Act claim as a matter of law, but disagree with its request for
rendition for the specified amount of interest.

Uncontested evidence Cadence withheld a total of $811,762
of the final contract amount, i.e., at least $271,762 more than the total of
the busway credit and Premier=s retainage.   Property Code
section 28.002 provides in relevant part:

(a) If an owner or a person authorized to act on
behalf of the owner receives a written payment request from a contractor for an
amount that is allowed to the contractor under the contract for properly
performed work or suitably stored or specially fabricated materials, the owner
shall pay the amount to the contractor, less any amount withheld as authorized
by statute, not later than the 35th day after the date the owner receives the
request.

(b) A contractor who receives a payment under
Subsection (a) or otherwise from an owner in connection with a contract to
improve real property shall pay each of its subcontractors the portion of the
owner=s payment, including interest, if
any, that is attributable to work properly performed or materials suitably
stored or specially fabricated as provided under the contract by that
subcontractor, to the extent of that subcontractor=s interest in the owner=s payment.  The payment required by
this subsection must be made not later than the seventh day after the date the
contractor receives the owner=s payment.

 

Tex. Prop. Code Ann. ' 28.002(a)B(b) (Vernon 2000).








Premier made its final payment, minus $240,000 in
retainage, to Cadence on March 24, 2004.  Uncontested evidence established
Design=s work under the
subcontract and authorized change orders totaled $4,100,553.[24] 
The parties agreed Cadence had paid Design only $3,588,791 before commencement
of the trial.  Thus, after taking into account the $300,000 credit Cadence
claimed for the busway change and the $240,000 in retainage it requested
Premier to keep, Cadence was still withholding an additional $271,762 for a
total of $811,762.

Conditions precedent.  Cadence argues Design is not
entitled to any of the $811,762 because Design failed to meet two conditions
precedent.  Cadence refers to Design=s not having
provided documentation for the busway credit and to Design=s not having
released its liens on the property.[25]








Conditions precedent are acts or events that occur
subsequently to the formation of a contract and that must occur before there is
a right to immediate performance and before there can be a breach of
contractual duty.  McMahan v. Greenwood, 108 S.W.3d 467, 484 (Tex. App.CHouston [14th
Dist.] 2003, pet. denied).  When a plaintiff alleges all conditions precedent
have been performed, it must prove the performance of only those conditions
precedent the defendant specifically denies.  Lidawi v. Progressive County
Mut. Ins. Co., 112 S.W.3d 725, 729 n.1 (Tex. App.CHouston [14th
Dist.] 2003, no pet.).   Thus, when the plaintiff makes a general allegation
all conditions precedent have been performed, the burden of pleading, but not
burden of proof, shifts to the defendant.  Id.

To determine whether a condition precedent exists, a court
must ascertain the intention of the parties, and it can do so only by looking
at the entire contract.  McMahan, 108 S.W.3d at 484 (citing Criswell
v. European Crossroads Shopping Ctr., Ltd., 792 S.W.2d 945, 948 (Tex.
1990)).  Normally, to create a condition precedent, parties to an agreement
must use a term such as Aon condition that,@ Aif,@ Aprovided that,@ or some similar
conditional phrase.  Id.  Conditions precedent are not favored in the
law, and courts tend to construe contract provisions as covenants rather than
as conditions.  Id. (citing Criswell, 792 S.W.2d at 948).

In support of its contention that documentation of the
busway credit was a condition precedent to Cadence=s obligation to
pay, Cadence points to the following language in the subcontract:  AWhen quoting
change proposals, Subcontractor shall provide a detailed, itemized breakdown of
cost in support of change proposal [sic], whether additive or deductive. 
A single lump sum price without any description, itemization or explanation
will not be accepted.@  This language does not in any manner tie
payment to provision of documentation for a change order, much less condition
payment on provision of such documentation.  When the parties intended an event
to be a condition precedent, they inserted the term Acondition
precedent@ in the subcontract.[26]  








Cadence also argues Design failed to fulfill a condition
precedent by not releasing Design=s liens on the
property until shortly before trial.  Cadence, however, did not plead release
of lien as a condition precedent.  In its seventh amended answer, Cadence
alleged only ADefendants plead the affirmative defense of failure of
conditions precedent.  Cadence McShane has not received payment from the Owner
for all amounts claimed by Design Electric.  Additionally, Design Electric has
not completed and submitted all project documentation.@[27]  Because Cadence
did not plead lien release as a condition precedent, Design never had the
burden of proof to establish that condition had been satisfied.  See Tex. R. Civ. P. 54 (AWhen such
[conditions precedent] have been so plead [sic], the party so pleading same
shall be required to prove only such of them as are specifically denied by the
opposite party.@).

Even were we to conclude Design sufficiently pleaded
release of lien as a condition  precedent, the only contract language
conditioning payment on release of liens involves liens filed by those
providing supplies or services to Design:

Contractor may, as a condition precedent to any
payment, require Subcontractor to submit satisfactory evidence of payments of,
and waivers of, and releases from, any and all claims by any persons, firms or
corporations having performed work or labor, supplied services, or supplied
material for Subcontractor.  Such evidence, waivers and releases must in any
event be submitted as a condition precedent to final payment which shall be
made upon completion of the Work to the satisfaction of Contractor and after
approval by all governmental authorities having jurisdiction and the issuance
of a certificate of occupancy, provided as a condition precedent, like payment
has been made by Owner to Contractor (unless, and only unless Owner=s failure to pay Contractor is the
result of default by Contractor unrelated to Subcontractor=s performance hereunder, it being
expressly understood that any other basis for such non-payment by Owner
including the bankruptcy or insolvency of Owner will not excuse this condition
precedent).

 








The preceding paragraph, although clearly setting a
condition precedent to final payment, does not refer to Design=s liens, but to
liens filed by Design=s subcontractors.[28] 
This paragraph does not render release of Design=s liens on the
Project a condition precedent to payment.

Good faith dispute and amount in question.  Property Code
section 28.003(b) provides in relevant part:

If a good faith dispute exists concerning the amount
owed for a payment requested or required by this chapter under a contract for
construction of or improvements to real property, excluding a detached single‑family
residence, duplex, triplex, or quadruplex, the owner, contractor, or
subcontractor that is disputing its obligation to pay or the amount of payment
may withhold from the payment owed not more than 100 percent of the
difference between the amount the obligee claims is due and the amount the
obligor claims is due.

 

Tex. Prop. Code Ann. ' 28.003(b) (Vernon
2000) (emphasis added).  The parties agree Cadence was justified in withholding
some payment under this section.  They disagree, however, regarding the amount.

Design contends there is no evidence to support a good
faith dispute concerning at least $271,762 of the amount withheld (accepting a
busway credit of $540,000) and up to $511,762 of the amount withheld (accepting
the trial court=s finding of a busway credit of
$300,000).  Put differently, Design argues Cadence wrongfully withheld at least
$271,762 and possibly as much as $511,762.

Cadence argues it was entitled to withhold the entire
$811,762.  Cadence bases this contention on its claim Design was not entitled
to any payment because of Aits failure to provide documentation
showing the amount of credit due for the less expensive busway and its failure
to provide lien releases, both conditions precedent to payment.@  We have,
however, rejected Cadence=s argument that these acts were conditions
precedent to payment.  Accordingly, we reject Cadence=s argument it was
entitled to withhold the entire $811,762.

We hold the good faith dispute extended only to each party=s claim of the
credit due for the elimination of the busway.  Accordingly, we sustain Design=s issue one.








Nevertheless, we conclude it is inappropriate to render
judgment under the Prompt Payment Act as Design requests.  In its prayer for
relief under the Prompt Payment Act, Design states:

Cadence has wrongfully withheld funds that [Premier] forwarded to it
that should have been paid to Design. That failure continues through the filing
of this brief C Cadence has never tendered any
amount of the $811,000 it owes Design.  Section 28.004 of the Act provides that
interest accrues at one and half percent per month (eighteen percent per year)
and starts accruing on the day after the date on which the payment becomes
due.  Design=s payment became due at the very
latest on March 24, 2004, the date that Premier made its final payment to
Cadence.  Thus, this Court should render judgment for Design and award it pre‑judgment
interest at one and half percent per month on $271,762 ($134.02 per day) from
February 8, 2004 [sic] until the time of the Court=s judgment and normal interest on
the remaining $240,000 due under Design=s subcontract.  Under the Act, Design is also entitled to
an award of attorney=s fees.  (Footnote and record
citations omitted.).

 

An award of interest on $217,762 assumes Cadence, at the
point of final payment, was claiming it was due $540,000 for the busway
credit.  Design apparently bases this assumption on Cadence=s request that
Premier withhold $240,000 in retainage.  There is no evidence, however, that
all of the $240,000 in retainage was attributable to what Cadence claimed was
due for the busway credit.  Instead, the agreement between Premier and Cadence
provided:

Owner agrees to make payment or cause payment to be made of the
$240,000 withheld for the Design Electric lien, or such lesser amount as it
[sic] finally determined to be owed to Design Electric by Owner or Contractor,
to Contractor on or before the earlier of the following:

a)       Design Electric executes a full and final
release for the Project;

b)       The statute of limitations has expired on
Design Electric=s bond claims without Design
Electric filing suit against Owner;

c)       The matter is resolved by settlement.

 








When Design questioned Cadence Vice President Craig Hudeck
whether the only reason Premier was withholding the $240,000 was because of the
dispute about the proper busway credit, Hudeck responded, AI don=t know if that=s the only reason.@[29]  Thus, the
$240,000 does not support the assumption that Cadence, at the point of final
payment, was claiming a busway credit of $540,000.  Additionally, the
uncontroverted evidence showed that, as of December 22, 2000, Cadence was
representing to Premier the busway credit was $300,000; and on October 6, 2002,
Cadence issued a change order modifying its subcontract with Design to include
a $300,000 credit for the busway.

The trial court=s findings of fact
and conclusions of law also support the conclusion Cadence, in good faith,
could claim only $300,000 for the busway credit.  The trial court found, AThe correct credit
for the elimination of the current limiting high reactance busway is $300,000.@  Additionally,
the trial court concluded Cadence was entitled to $240,000 from Premier, and
Design was entitled to $240,000 from Cadence.

In finding Design=s Prompt Payment
Act claim was defeated because at all times there was a good faith dispute
regarding the amount owed Design, the trial court implicitly found there was a
good faith dispute regarding the entire $811,762.  As discussed above, to the
extent that finding was based on failure of conditions precedent, it was in
error.

Because the trial court found there was a good faith
dispute regarding the entire amount, it did not find an amount attributable to
the dispute over the busway credit or what amounts Cadence was withholding in
addition to the amount attributable to the busway credit dispute.  Because the
trial court found a good faith dispute existed at all times, it did not make
any findings regarding when Cadence owed Design amounts over the amount
attributable to the busway credit dispute.








Accordingly, we remand Design=s Prompt Payment
Act claim to the trial court to make additional findings regarding (1) the
amount in good faith dispute over the busway, (2) the amounts Cadence owed
Design over the amount attributable to the busway dispute, (3) the date on
which those amounts became due, and (4) the section 28.004 interest on those
amounts.[30] 
We further remand for the trial court to render judgment awarding Design the
section 28.004 interest due Design and to consider, in its discretion, an award
of attorney=s fees under Property Code section 28.005.  See Tex. Prop. Code Ann. '' 28.004, .005
(Vernon 2000); Bocquet, 972 S.W.2d at 20.

In sum, we sustain Design=s issue one and
remand for a determination of the amounts due Design under the Prompt Payment
Act.

Issue Two:  Design=s Claim for Breach of Contract

 

The arguments.  In issue two, Design contends it proved
its breach of contract claim against Cadence as a matter of law.  Design also
contends there is no evidence it materially breached the subcontract in a
manner that would excuse Cadence from performing.  As part of issue two, Design
argues, even if Design breached the subcontract, Cadence was liable under the
doctrine of substantial performance.[31]








In response, Cadence relies in part on its contention
Design failed to satisfy conditions precedent to payment, a contention we
rejected above.  Cadence also recasts its argument regarding the conditions
precedent and contends Design=s failure to provide documentation showing
the cost of the installed busway and failure to provide the lien releases until
just before trial constituted material breaches on Design=s part causing
damage to Cadence.  Cadence did not plead prior breach as an affirmative
defense and does not respond to Design=s argument that
its alleged breaches do not rise to the level of an affirmative defense. 
Nevertheless the trial court found Cadence had established its affirmative
defense of prior breach and Design challenges this finding on appeal. 
Therefore, in an abundance of caution and after discussing the evidence
establishing Cadence=s breach, we address whether Design=s failure to
document adequately the busway change rose to the level of an affirmative
defense that would defeat Design=s breach of
contract claim.[32]

Cadence=s breach.  The subcontract
required Design to perform electrical work on the Project and required Cadence
to pay Design Afor the full and complete performance of all of
[Design=s] obligations
hereunder.@  Cadence concedes Design Asubstantially
completed its work on the Project.@  Cadence Vice
President, Craig Hudeck, testified Design had no remaining work to complete and
there were no deficiencies in the work it performed.  This evidence is
undisputed.

After applying a $300,000 busway credit, the trial court
found Design was still owed $271,762 for work done on the subcontract and was
also entitled to the $240,000 retainage.  Thus, the trial court found Cadence
had not paid Design $511,762 of the subcontract amount.  Except for disputing
the amount of credit for the busway, the parties appear to agree the evidence
conclusively established at least this amount.  Therefore, unless Cadence
established an affirmative defense, Design established its breach of contract
claim as a matter of law.  We turn now to the legal question of whether Design=s breaches could
provide Cadence with an affirmative defense.








Prior breach as an affirmative defense.  Not every breach
of contract rises to the level of an affirmative defense.  Hollander v.
Capon, 853 S.W.2d 723, 725 (Tex. App.CHouston [1st
Dist.] 1993, writ denied).  Covenants in a contract must be mutually dependent
for breach of one covenant to constitute a bar to a party=s right to recover
on another covenant.  See Hanks v. GAB Bus. Servs., Inc., 644
S.W.2d 707, 708 (Tex. 1982) (stating prerequisite to remedy of excuse of
performance is that covenants must be mutually dependent promises).  Mutually
dependent covenants relate to the entire consideration on both sides, so each
covenant is such an indispensable part of what both parties intended that the
parties would not have entered into the contract with the covenant omitted.  Greenstein
v. Simpson, 660 S.W.2d 155, 160 (Tex. AppCWaco 1983, writ
ref=d n.r.e.).

When obligations imposed on one party are independent of,
or subsidiary to, obligations imposed on the other party, one party=s breach does not
constitute a repudiation of a contract excusing the other party from continued
performance.  Earl Hayes Rents Cars & Trucks v. City of Houston, 557
S.W.2d 316, 320 (Tex. Civ. App.CHouston [1st Dist.] 1977, writ ref=d n.r.e.) (citing Scarborough
v. Arrant, 25 Tex. 129 (1860)).  When a covenant relates only to part of
the consideration on both sides and damages may compensate for a breach, it is
to be regarded as an independent covenant, unless this construction is contrary
to the expressed intent of the parties.  Hanks, 644 S.W.2d at 708.  The
prevailing rule is that, when a promise is to be performed in the course of the
performance of the contract, and after some of the consideration of which it
forms a part has been given, it will be regarded as subsidiary and its breach
will not effect a discharge.  Earl Hayes, 557 S.W.2d at 321.








Hollander v. Capon is instructive.  After Rita and Sim Capon
divorced, Rita secured custody of their four children.  Hollander, 853
S.W.2d at 724.  Rita was subsequently killed in an automobile accident, and
Rita=s brother, Richard
Hollander, became the children=s legal guardian.  Id.  Capon and
Hollander then entered into a multiple paragraph support agreement, under which
Capon would pay weekly child support, until each child turned twenty-one or was
otherwise emancipated.  Id.  Capon agreed to pay the full cost of a college
education, provided he was financially able to do so.  Id.  In a single
paragraph, Hollander agreed to encourage the children to maintain a healthy and
positive relationship with their father.  Id.  at 725.

Capon=s payments were very sporadic, and
Hollander sued to enforce the agreement.  Id. at 724.  Just before
trial, Capon attempted to raise breach of contract as an affirmative defense,
and the trial court refused to permit Capon to amend his answer.  Id. at
725.  The court of appeals held the trial court erred in not permitting the
amendment, but the error was harmless.  Id. at 725B26.  Relying on Hanks,
the appellate court explained:

It is uncontested that Hollander provided the
children with care, sustenance, housing, and education, and, in return, Capon
agreed to pay child support.  The Abreach of contract@ Capon attempted to allege as an affirmative defense was
that Hollander failed to encourage a healthy and positive relationship between
the children and Capon.

. . .

Capon, the natural father, entered into a written agreement to pay a
certain amount per month in child support to Hollander, the legal guardian of
the children, who housed, fed, educated, and took care of the children.  If
Hollander failed to Aencourage the children to maintain
a healthy and positive relationship@ with Capon, perhaps Capon could recover damages for
Hollander=s failure to perform as agreed, but
Capon would not be relieved of his contractual support obligations.

 

Id. at 725B26 (citing Hanks,
644 S.W.2d at 708).








Therefore, Hollander=s covenant to
encourage the children to maintain a healthy and positive relationship with
their father related only to part of the consideration on both sides, and
damages might compensate for a breach.  Similarly, Design=s covenant to
provide specified documentation for a change order related only to part of the
consideration on both sides, and Cadence has sued for damages related to that
breach.  See Hanks, 644 S.W.2d at 708.  Design=s obligation to
provide documentation for busway change was independent from Cadence=s obligation to
pay Design for work done.  Design=s failure to
document the busway change adequately did not excuse Cadence from paying
$511,762, the subcontract amount due after the busway credit.[33]

Accordingly, we conclude Cadence presented no evidence to
establish prior breach as an affirmative defense.  We sustain Design=s issue two and
need not reach Design=s argument regarding substantial
performance.

Issue
Five:  Cadence=s Affirmative
Defenses of Waiver and Unclean Hands.

In issue five, Design challenges the legal and factual
sufficiency of the evidence to support Cadence=s affirmative
defenses of estoppel, waiver, and unclean hands.  In our discussion of issue
four, above, we concluded the evidence was legally and factually sufficient  to
support the trial court=s finding Design was estopped from
claiming a busway credit of less than $300,000.  We turn now to waiver and
unclean hands.

Waiver.  The trial court found, ACadence McShane=s affirmative
defense of waiver is established.  By failing to timely submit billings that
accurately reflected the work performed in a draw period, Design Electric
waived its rights, if any, to complain of nonpayment.@

Waiver is an intentional relinquishment of a known right or
intentional conduct inconsistent with claiming that right.  Jernigan v.
Langley, 111 S.W.3d 153, 156 (Tex. 2003).  Waiver is largely a matter of
intent, and for implied waiver to be found through a party=s actions, intent
must be clearly demonstrated by the surrounding facts and circumstances.  Id. 
If the person charged with waiver says or does nothing inconsistent with an
intent to rely upon a right, there can be no waiver of such right.  Id.
Waiver is ordinarily a question of fact, but when the surrounding facts and
circumstances are undisputed, the question becomes one of law.  Id. at
156B57.








It is undisputed Design substantially completed its work on
the Project in a satisfactory manner.  Design consistently submitted payment
applications.

Failure to document the busway change in an adequate and
timely manner is the only evidence of Awaiver@ to which Cadence
points.  Under issue one, above, we held that documentation of the busway
credit was not a condition precedent to payment.  Under issue two, we held
documentation was independent from Cadence=s obligation to
pay Design for work done.  Design=s failure to
document the busway does not constitute evidence that it waived its right to
payment for work done.

Unclean hands.  The trial court found, ACadence McShane=s affirmative
defense of unclean hands is established.  Design Electric=s concealing
information necessary to determine the full credit for eliminating the current
limiting high reactance service entrance busway and providing incorrect
information bar any complaint by Design Electric that Cadence McShane did not
make payment.@

The clean-hands doctrine is A[t]he principle
that a party cannot seek equitable relief or assert an equitable defense if
that party had violated an equitable principle, such as good faith. . . .  Such
party is described as having >unclean hands.=@  Black=s Law Dictionary 268 (8th ed. 2004).  When seeking
an equitable remedy, a party must do equity and come to the court with clean
hands.   Breaux v. Allied Bank, 699 S.W.2d 599, 604 (Tex. App.CHouston [14th
Dist.] 1985, writ ref=d n.r.e.).








A court should not apply the clean hands maxim when the
defendant has not been seriously harmed and the wrong of which it complains can
be corrected without applying the doctrine.  In re Jim Walter Homes, Inc.,
207 S.W.3d 888, 899 (Tex. App.CHouston [14th Dist.] 2006, orig.
proceeding). More importantly for the present case, the Aclean hands@ maxim is strictly
an equitable doctrine and not applicable outside equitable proceedings.  Furr
v. Hall, 553 S.W.2d 666, 672 (Tex. Civ. App.CAmarillo 1977,
writ ref=d n.r.e.); Ligon
v. E.F. Hutton & Co., 428 S.W.2d 434, 437 (Tex. Civ. App.CDallas 1968, writ
ref=d n.r.e.);  Greever
v. Persky, 156 S.W.2d 566, 569 (Tex. Civ. App.CFort Worth 1941), aff=d 140 Tex. 64, 165
S.W.2d 709 (1942). 

Except for the finding on substantial performance, which we
need not reach, Design is not contesting the trial court=s findings on its
equitable claims.  Design is also not contesting the trial court=s findings against
Design on Design=s equitable defenses of waiver, estoppel,
and ratification.[34]

The issue before us, therefore, is the legal and factual
sufficiency of the evidence to support Cadence=s unclean hands
defense solely as it relates to Design=s statutory claim
under the Prompt Payment Act and Design=s common law claim
for breach of contract.  These are not equitable actions, and Cadence=s clean hands
defense is inapplicable.  See Furr, 553 S.W.2d at 672; Ligon,
428 S.W.2d at 437;  Greever, 156 S.W.2d at 569; see also Sammons
Enters., Inc. v. Manley, 540 S.W.2d 751, 757 (Tex. Civ. App.CTexarkana 1976,
writ ref=d n.r.e.)
(concluding appellant=s unclean hands argument lacked merit
because action was one at law for breach of contract damages).  Cadence=s evidence in
support of its clean hands defense is therefore legally insufficient to defeat
Design=s Prompt Payment
Act and breach of contract claims.

We overrule Design=s fifth issue insofar
as it relates to the sufficiency of the evidence to support Cadence=s estoppel
defense.  We sustain Design=s fifth issue insofar as it relates to the
sufficiency of the evidence to support Cadence=s waiver and
unclean hands defenses.

 

 








Issue
Three:  Attorneys= Fees

We arrive, at last, at the gravamen of the appeal.  In
issue three, Design argues the trial court erred in awarding Cadence its
attorneys= fees and in denying Design its attorneys= fees.  We have
discussed Prompt Payment Act attorneys= fees in issue one
above and have remanded for the trial court to consider, in its discretion, an
award of attorney=s fees under Property Code section 28.005.  See Tex. Prop. Code Ann. ' 28.005. 
Accordingly, we confine our discussion of Design=s third issue to
attorneys= fees under Texas Civil Practice and Remedies section
38.001, which provides, AA person may recover reasonable attorney=s fees from an
individual or corporation, in addition to the amount of a valid claim and
costs, if the claim is for . . . performed labor . . . or . . . an oral or
written contract.@  Tex.
Civ. Prac. & Rem. Code Ann. ' 38.001 (Vernon
1997).

To recover attorneys= fees under
section 38.001, a  party must (1) prevail on a cause of action for which
attorneys= fees are recoverable and (2) recover damages.  Green
Int=l, Inc. v. Solis, 951 S.W.2d 384,
390 (Tex. 1997).  A party must also meet the procedural requirements of section
38.002, which are (1) the claimant=s representation
by an attorney; (2) presentation of the claim to the opposing party or to its
duly authorized agent; and (3) payment for the just amount owed not being
tendered before the expiration of the thirtieth day after presentation of the
claim.  Tex. Civ. Prac. & Rem. Code
Ann. ' 38.002 (Vernon 1997).








The prevailing party is one who successfully prosecutes the
action or successfully defends against it, prevailing on the main issue, even
though not to the extent of its original contention.  FDIC v. Graham,
882 S.W.2d 890, 900 (Tex. App.CHouston [14th Dist.] 1994, no writ).  Put
differently, the prevailing party is the one vindicated by the trial court=s judgment.  4901
Main, Inc. v. TAS Auto., Inc., 187 S.W.3d 627, 634 (Tex. App.CHouston [14th
Dist.] 2006, no pet.).  Determination of whether a party is the prevailing or
successful party must be based on success on the merits.  Id.  To be
considered the prevailing party, one must recover money or at least something
of value.  Butler v. Arrow Mirror & Glass, Inc., 51 S.W.3d 787, 797
(Tex. App.CHouston [1st Dist.] 2001, no pet.); see Williams v.
Compressor Eng=g Corp., 704 S.W.2d 469,
474 (Tex. App.CHouston [14th Dist.] 1986, writ ref=d n.r.e)
(upholding award of attorneys= fees when employer was granted
injunction, but not damages, against former employee for breach of covenant not
to compete).  A net recovery, however,  is not necessary to obtain attorneys= fees under
section 38.001.  See McKinley v. Drozd, 685 S.W.2d 7, 10B11 (Tex. 1985)
(construing predecessor to section 38.001).

In its breach of contract claim, Design was seeking the
amount Cadence still owed it under the subcontract.  At the time of trial,
Design was withholding $811,772 of the subcontract amount.[35] 
This amount included a $300,000 credit for the busway change and the $240,000
Premier was retaining at Cadence=s request.

As we held above, Design established its breach of contract
claim against Cadence.  The trial court awarded Design the $240,000 in
retainage plus an additional $271,762.[36]

The trial court also found Cadence was entitled to a
$300,000 busway credit.  This amount, however, was only $172,000 to $180,000
more than the amount Design had conceded for the credit, but was considerably
less than the $690,547.83 Cadence at one point represented it was due.








Although the busway credit affected the amount of Design=s recovery on its
breach of contract claim, we cannot say the busway credit was the main issue in
the trial or that Cadence was vindicated in relation to that issue when the
judgment granted it a credit of only $172,000 to $180,000 more than that
conceded by Design.  We hold the trial court erred in (1) determining Cadence
was the prevailing party, (2) awarding Cadence section 38.001 attorneys= fees, and (3) not
considering whether, or in what amount, Design was entitled to section 38.001
attorneys= fees.

Accordingly, we sustain Design=s issue three.  We
remand with instructions that the trial court consider (1) whether Design met
the section 38.002 requirements, and (2) if so, the reasonable fees it should
recover.

Conclusion

We overrule Design=s issue four and
that part of issue five relating to Cadence=s estoppel
defense.  We therefore affirm the trial court=s judgment to the
extent it applies a busway credit of $300,000.

We sustain Design=s issue one and
reverse the trial court=s judgment in favor of Cadence and against
Design on Design=s Prompt Payment Act claim.  We remand
Design=s Prompt Payment
Act claim to the trial court to make additional findings regarding (1) the
amount in good faith dispute over the busway, (2) the amounts Cadence owed
Design over the amount attributable to the busway dispute, (3) the date on
which those amounts became due, and (4) the section 28.004 interest on those
amounts.[37] 
We further remand for the trial court to render judgment awarding Design the
section 28.004 interest due Design and to consider, in its discretion, an award
of attorney=s fees under Property Code section 28.005.








We sustain Design=s issue two and
its issue five relating to Cadence=s waiver and
unclean hands defense.  We therefore reverse the trial court=s judgment in
favor of Cadence and against Design on Design=s breach of
contract claim.  We affirm the trial court=s judgment to the
extent it awarded Design $511,762 in damages for that claim.

We sustain Design=s issue three.  We reverse the
trial court=s judgment awarding Cadence its
attorneys= fees and denying Design its
attorneys= fees.  We remand with instructions
that the trial court consider (1) whether Design met the requirements of Civil
Practice and Remedies Code section 38.002, and (2) if so, the reasonable fees
Design should recover.

 

 

 

/s/      Charles Seymore

Justice

 

 

 

 

Judgment rendered
and Opinion filed October 30, 2007.

Panel consists of
Justices Yates, Seymore, and Edelman.*


 

 

 









[1]  Design disputed only $172,000 to $180,000 of this
amount.





[2]  This figure reflects the following calculations:

 


 
 
  
 $511,762.00
 
 
  
 amount
 Cadence owed Design for work done
 
 
 
 
  
 - 240,000.00
 
 
  
 the
 amount Premier was retaining
 
 
 
 
  
 271,762.00
 
 
  
 amount
 Cadence owed Design after passing on the Premier retainage
 
 
 
 
  
 - 286,945.50
 
 
  
 attorneys= fees Design owed Cadence
 
 
 
 
  
 $   15,183.50
 
 
  
 amount
 to Cadence after offset for attorneys=
 fees
 
 


 





[3]  For clarity, we will refer to the contract between
Premier and Cadence as Athe general contract,@ and the contract between Cadence and Design as the Asubcontract.@





[4]  In addition to the core building, Design=s contract with Cadence included common areas, five
garage levels, and a generator, for a total of $1,722,795.





[5]  Fred Haranda, Design=s estimator for the Project, was the most frequently cited source of
this information.





[6]  This engineer testified he understood the cost
savings would be $10,000 per foot.  The $400,000 savings would therefore
reflect a forty foot busway.  Design=s
bill of materials, however, requested a sixty foot busway.





[7]  Design kept  $8,000 of the $128,000 for overhead or
additional costs incurred to help facilitate the changes.





[8]  Only $10,000 of this amount, for the security
package, might have involved Design=s
work.





[9]  This amount incorporates the $300,000 busway credit.





[10]  On appeal, Design does not challenge the trial court=s failure to award this amount.





[11]  Cadence actually conceded additional changes
amounting to $35,256, but, in their appellate briefs, both parties based their
calculations on $35,250, so we will do the same.





[12]  The evidence reflects an undisputed amount of
$3,588,797.  In a letter to the court, however, Design represented this amount
as $3,588,791, and that amount remained in the court=s calculations.  To avoid even further confusion, we
will refer to the paid amount as $3,588,791.





[13]  The Atotal completed
and stored to date@ on Cadence=s
application for payment was $41,452,466Cthe
same amount as on the application for payment accompanying its October 1, 2003,
certification that all amounts were due and payable.  The retainage, however,
had increased from $100,000 in October 2003 to $240,000 in February 2004.





[14]  See Tex.
Prop. Code Ann. '' 28.001B.010
(Vernon 2000).  We shall refer to these sections as the Prompt Payment Act.





[15]  On July 28, 2005, Design filed its final release of
liens.





[16]  The variation in the calculation of the award to
Design rests on how one characterizes the $240,000 Premier withheld at Cadence=s request.





[17]  As Cadence observed in the trial court, AAs of today [November 11, 2005], these two Parties
have incurred combined attorney fees exceeding $540,000 to fight over . . .
$180,000.@





[18]  Design presents the following nine arguments:  (1)
the trial court erred in failing to find Cadence violated the Prompt Payment
Act by withholding $811,000 for, at most, a $540,000 dispute; (2) Design proved
as a matter of law that Cadence breached the subcontract and owes Design
$683,762; (3) the trial court abused its discretion in awarding Cadence its
attorneys= fees and in not awarding Design its attorneys= fees; (4) no evidence supports the trial court=s finding Design materially breached the subcontract;
(5) no evidence supports Cadence=s
credit against the undisputed amounts owed under the subcontract; (6) Design
proved as a matter of law that Cadence was liable under the doctrine of
substantial performance; (7) no evidence supports Cadence=s waiver defense; (8) no evidence supports Cadence=s estoppel defense; and (9) no evidence supports
Cadence=s unclean hands defense.





[19]  In its issues presented, Design represents that the
only evidence established a credit of $120,000; in its argument, it represents
the only evidence established a credit of $128,000.  Although there was
evidence showing the price of the installed busway as $36,892.17, there is no
evidence regarding how much of Design=s
original bid was attributable to the current limiting, high reactance busway
originally specified.  The only evidence of the reduction attributable to the
busway change were Rexel=s memo to Design indicating a $128,000 deduct and a
handwritten calculation on a core building recap.  The trial court found these
documents did not constitute credible proof of the amount of the credit.





[20]  The trial court found, ACadence McShane=s
affirmative defense of estoppel is established.  Cadence McShane substantially
relied to its detriment on Design Electric=s
representations that the service busway cost $10,000 per linear foot and that
Design Electric would return savings of at least $300,000 if the high reactance
busway was deleted.@





[21]  Design cites Bocanegra v. Aetna Life Insurance.
Co., for the proposition that, absent deception, there can be no estoppel. 
605 S.W.2d 848, 851 (Tex. 1980).  The focus of Bocanegra was the
defense  of election.  In the course of distinguishing election from other
equitable defenses, the court stated, A[e]quitable
estoppel differs from [election, judicial estoppel, ratification, waiver, and
satisfaction] because it requires some deception that is practiced upon a party
who relies upon it to his prejudice.@ Id. 
The proposition was not germane to the decision, and no published case has
cited Bocanegra for this proposition.  In the cases cited in Bocanegra,
the courts simply discuss the elements of equitable estoppel set forth above.  See
Barfield v. Howard M. Smith Co. of Amarillo, 426 S.W.2d 834, 838 (Tex.
1968) (discussing elements and stating when real facts were known to person or
were open for his convenient ascertainment, he was not justified in relying on
representation pertaining thereto and cannot effectively say he was misled or
deceived by such

representations);
Concord Oil Co. v. Alco Oil & Gas Corp., 387 S.W.2d 635, 639 (Tex.
1965) (stating essential element of estoppel is party relying on estoppel must
have acted on it to his prejudice and party seeking advantage estoppel must
establish that he has been misled to his injury); Gulbenkian v. Penn,
151 Tex. 412, 252 S.W.2d 929, 932 (1952) (listing elements).  We therefore
conclude deception is encompassed in the five elements of estoppel discussed
above.





[22]  The testimony was as follows:

 

Q [counsel for Cadence].   Sir, isn=t it true that you have a vague recollection of
HarandaCMr. Haranda suggesting that Cadence McShane trade
savings for lossesClosses on an Austin project for savings on this
project?

 

A  [Snider].  I do vaguely recall a small portion of a
discussion that was made.  I don=t
remember who was there, but I do recall some comments being made.





[23]  In addition to challenging this finding, Design
challenges, among others,  the following findings related to Cadence=s defenses of failure of conditions precedent and good
faith dispute:   A26. Cadence McShane=s
withholding payment of money that may otherwise be due, is excused by each of
Design Electric=s failure [sic] to comply with material obligations under
the parties= agreement@; A29. Design Electric failed to comply with these
agreements to provide documentation of the full credit for the deletion of the
high reactance busway@; A30. Design
Electric=s failure [sic] to comply were material breaches of
the contract@; A48.  Cadence
McShane=s affirmative defense of failure of conditions
precedent is established.  Specifically Design Electric failed to provide all
required contract documentation and to release its liens.@





[24]  $4,065,303 (final subcontract amount after deducting
a 300,000 credit for the busway change) + $35,250 (amount of additional work
Cadence conceded Design had completed) = $4,100,553.





[25]  In a footnote, Cadence observes, AThe subcontract provides that >as a condition precedent to any such payment [by
Cadence to Design], like payment has been made by [Premier] to [Cadence].= . . . Because Premier withheld $240,000 from Cadence,
Design was not yet entitled to this sum.@ 
Premier withheld this amount based on an agreement between Premier and Cadence
executed in February 2004.  In October 2003, however, Cadence had requested a
retainage of only $100,000 from the final amount due and owing, and only
$10,000 of that $100,000 even arguably involved Design=s work.  Thus Cadence=s, and not Design=s, action made it impossible for the condition in
question to occur.  See Ebberts v. Carpenter Prod.  Co., 256 S.W.2d 601,
618 (Tex. Civ. App.CBeaumont 1953, writ ref=d n.r.e.) (stating, when  promissor=s
own act makes it impossible for condition on which promise depended to occur,
the particular condition is discharged and promissor becomes absolutely bound
to give promised performance).  We have found no authority that would allow a
general contractor to subvert the Prompt Payment Act by agreement with the
owner for additional retainage not warranted by a defect in the subcontractor=s work.





[26]  We count at least eight occurrences of Acondition[s] precedent@ in the four-page body of the subcontract.





[27]  On appeal, to establish it pleaded release of lien
as a condition precedent, Cadence relies on its  invalid bond claim.  In that
claim for declaratory judgment, Cadence alleged, ADesign Electric filed liens and affidavits to collect on a payment bond
issued by Safeco.  Design Electric failed to properly perfect the claims per
statute.  Defendants seek a declaration that the bond claims are invalid . . .
.@





[28]  Accordingly, TA Operating Corp. v. Solar
Applications Engineering, Inc., 191 S.W.3d 173,  (Tex. App.CSan Antonio 2005, pet. granted), is distinguishable
from the present case.





[29]  Design does not challenge the trial court=s finding Premier Towers withheld the $240,000 Aas a result of liens filed by Design Electric and the
credit dispute.@





[30]  In addition to requesting we calculate interest on
$271,762, Design requests the interest accrue from February 8, 2004.  Under
Property Code section 28.002(b), Cadence was required to pay Design not later
than the seventh day after Cadence received Premier=s payment.  Tex.
Prop. Code Ann. ' 28.002(b) (Vernon 2000).  Given that Premier paid
Cadence on March 24, 2004, then Cadence=s
final payment to Design was due no later than March 31, 2004, and  interest
would begin to accrue the following day, April 1, 2004.  See Tex. Prop. Code Ann. ' 28.004(a) (Vernon 2000).  Design=s request that interest accrue beginning February 8,
2004 is without basis in fact or law.





[31]  Design points to the trial court=s finding Cadence owed Design $511,762 after applying
the $300,000 credit for the busway changeCa
finding at odds with the trial court=s
findings against Design on its claims and in favor of Cadence on its defenses.





[32]  As we discussed above, the provision regarding the
release of liens did not apply to Design=s
liens against the property.





[33]  In its breach of contract argument, Design argues
Cadence owes it $683,762.  This amount assumes a busway credit of $128,000.  We
have held Design is estopped from claiming a busway credit of less than
$300,000, a credit reflected in the trial court=s award of $511,762 to Design.





[34]  In Steubner Realty 19, Ltd., v. Cravens Road 88,
Ltd., this court concluded the doctrine of unclean hands was available to
counter an estoppel defense raised in an action at law.  817 S.W.2d 160, 165
(Tex. App.CHouston [14th Dist.] 1991, no writ).





[35]  This figure is based on Cadence=s concession of additional work valued at $35,250,
rather than  Design=s contention of additional work valued at $ 43,947. 
The trial court=s award incorporated Cadence=s value, and Design does not contest this amount on
appeal.





[36]  Cadence contends Design=s entitlement to a portion of retained funds was not
an award of damages for purposes of determining who was the prevailing party. 
In support it cites Criton Corp. v. Highlands Ins. Co., 809 S.W.2d 355
(Tex. App.CHouston [14th Dist.] 1991, writ denied)); and Davis
Masonry, Inc. v. B‑F‑W Construction Co., 622 S.W.2d 144 (Tex.
Civ. App.CWaco 1981, no writ).  In both of those cases, the
trial court found the subcontractor had breached the contract and the general
contractor was entitled to an amount necessary to complete the work.  See
Criton Corp., 809 S.W.2d at 357; Davis Masonry, 622 S.W.2d at 146. 
Any retained amount due the subcontractor was reduced by the amount due the
general contractor for its reasonable expenses to complete the work.  In Criton
Corp., this court observed, AWhere
a general contractor recovers the amount necessary to complete the contract
less the amount the general contractor retains, the general contractor is the
prevailing party entitled to attorneys=
fees.@  809 S.W.2d at 357.  Criton and Davis
Masonry do not support Cadence=s
contention.





[37] As we previously noted, Design=s request that interest accrue beginning February 8,
2004 is without basis in fact or law.  See n.30, supra.





* 
Senior Justice Richard
H. Edelman sitting by assignment.