# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 18, 2013

Lyle W. Cayce
Clerk

No. 12-20545

STARR INDEMNITY & LIABILITY COMPANY,

Plaintiff - Appellee

v.

SGS PETROLEUM SERVICE CORPORATION, now known as SGS North
America, Incorporated,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JONES and CLEMENT, Circuit Judges, and KAZEN[*], District Judge.

KAZEN, District Judge:

An insurer sought a declaratory judgment that it was not required to show prejudice before denying coverage for liability arising out of a pollution occurrence which the insured did not report within thirty days, as required by a pollution buy-back clause in the policy. The district court granted the insurer's motion for judgment on the pleadings and denied the insured's motion for summary judgment. We AFFIRM.

---

[*] District Judge of the Southern District of Texas, sitting by designation.

1

No. 12-20545

## I. BACKGROUND

This diversity case involves a dispute over insurance coverage between Plaintiff-Appellee Starr Indemnity & Liability Company ("Starr"), a Texas-based insurance company, and Defendant-Appellant SGS Petroleum Service Corporation ("SGS"), a Delaware corporation that provides services to the petrochemical industry, including the transportation of toxic chemicals. Starr issued SGS an insurance policy that covered the period from December 31, 2009 to December 31, 2010. This was a bumbershoot (umbrella) policy that provided excess coverage beyond SGS's primary insurance policy with Allianz Global Risks US Insurance Co. ("Allianz"), which was limited to $2 million of coverage.

Starr's excess coverage policy contained an absolute pollution exclusion clause, which freed the insurer of "liability or expense arising . . . directly or indirectly in consequence of" the release or escape of pollutants and toxic chemicals. However, Starr and SGS had added to the policy a provision, commonly called a pollution "buy-back," which deleted the pollution exclusion and replaced it with the following:

> Notwithstanding anything to the contrary, this policy shall not apply to any claim arising directly or indirectly in consequence of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substance or derivative (including any oil refuse or oil mixed wastes) or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any watercourse or body of water. This exclusion ***shall not apply***, however, provided that the assured establishes that all of the

2

No. 12-20545

> following conditions have been met:
>
> . . .
>
> ***(4) the discharge, dispersal, release or escape was reported in writing to these underwriters within 30 days after having become known to the assured.***
>
> . . .
>
> Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the policy except as hereinabove set forth.

(emphasis added).

On November 7, 2010, an accidental release of the chemical meta-toluene diamine occurred while an SGS employee was conducting unloading operations at a Bayer chemical plant in Baytown, Texas. SGS learned of the release that same day. Based on the initial report and information Bayer provided SGS, the preliminary estimate for the clean-up costs was between $600,000 and $1 million. Because this was within the $2 million coverage limit of its primary policy with Allianz, SGS did not inform Starr of the release. However, on December 20, 2010, Bayer presented SGS with invoices reflecting clean-up costs of over $4 million. Only in late December did SGS first realize the costs exceeded $2 million and would trigger coverage beyond the limits of its policy with Allianz. On January 5, 2011, fifty-nine days after SGS learned of the chemical release, SGS sent an email reporting the release to Starr.

On June 30, 2011, Starr sought a declaratory judgment that its insurance policy did not cover SGS's claim because SGS failed to notify Starr of the chemical release within thirty days after learning of it. Starr also moved for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), asserting that, as a matter of Texas law, its bumbershoot insurance policy did not cover SGS's claim because SGS failed to comply with the 30-day notice

No. 12-20545

provision.  Around the same time, SGS moved for summary judgment, alleging that (1) the 30-day requirement must be construed as a covenant and not as a condition precedent; (2) failure to strictly comply with the 30-day requirement did not excuse Starr's performance absent prejudice; (3) Starr was not prejudiced as a matter of law; and (4) in the alternative, the policy was ambiguous and the Court must construe any ambiguity in favor of the insured.

The district court granted Starr's motion for judgment on the pleadings and denied SGS's motion for summary judgment.  Relying largely on our decision in *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653 (5th Cir. 1999), the court held that Starr did not need to show prejudice before denying coverage to SGS for late notice under the pollution buy-back provision.

## II.  STANDARD OF REVIEW

We review a district court's grant of a judgment on the pleadings *de novo*. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).  We also review a ruling on a motion for summary judgment *de novo*.  *McKee v. Brimmer*, 39 F.3d 94, 96 (5th Cir. 1994).  The parties do not dispute that Texas law applies to the interpretation of the insurance contract.  In deciding an issue of Texas state law, we rule as we believe the Texas Supreme Court would rule.  *Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 712 (5th Cir. 2005).

## III.  DISCUSSION

### A.  Our *Matador* decision

*Matador Petroleum Corp. v. St. Paul Surplus Lines* involved an insurance coverage dispute quite similar to that in the instant case.  In *Matador*, the insurer, St. Paul, issued an insurance policy containing an absolute pollution

4

No. 12-20545

exclusion clause that, among other things, specifically did not cover any injury or damage from pollution resulting from several sources, including waste pollution. 174 F.3d at 655. In addition to this basic policy, Matador, the insured, purchased an endorsement that provided "a narrow exception to the absolute pollution exclusion." *Id.* One specific provision of that exception required the insured to report any pollution incident "within 30 days of its beginning." *Id.* at 656. Subsequently, a drilling pit collapsed, causing a discharge of pollutants which seeped into adjacent property and waterways. *Id.* Matador reported the incident to the insurance company 38 days later and requested coverage under the policy for resulting damages claimed by adjacent landowners. *Id.* St. Paul declined the request because Matador had failed to report the pollution incident within 30 days, as required by the endorsement. The district court agreed and granted summary judgment to St. Paul. On appeal, we affirmed.

Matador's key argument in that case was that St. Paul suffered no prejudice from the delay of eight days in receiving notice of the incident and, therefore, St. Paul should not have been relieved of its obligation to provide coverage. *Id.* at 658. *Matador* explained that courts do not always require a showing of prejudice in order for an insurance company to deny coverage for a failure to comply with the notice provisions of the policy. Instead, the type of policy can dictate the result. *Id.* *Matador* further explained the difference between "occurrence" policies and "claims-made" policies. *Id.* at 658-59. We noted that the basic insurance contract in *Matador*, which excluded pollution coverage, was supplemented by the endorsement, constituting additional coverage for which the parties had bargained. *Id.* at 659. To extend the 30-day

notice period would have exposed the insurer "to a risk broader than the risk expressly insured against in the policy." *Id.* We observed that both the insured and the insurer were sophisticated commercial parties with comparable bargaining power, that the language of the endorsement was plain, and that timely reporting of the claim was one of the events necessary to trigger coverage. *Id.* at 659-60. We concluded that whether the insurance company suffered prejudice as a result of the late notice was irrelevant because the insurance policy was being enforced according to its terms.

In the instant case, the pertinent provisions of the insurance policy are virtually identical to those in *Matador*. Starr's excess coverage policy contained an absolute pollution exclusion clause, with no liability for the consequences of the release or escape of toxic chemicals or pollutants. However, SGS and Starr then negotiated a buy-back provision which deleted the exclusion and replaced it with a new provision providing coverage under certain specific conditions. One was that any discharge or escape of pollutants must be reported "within 30 days after having been known to the assured." The "assured," SGS, did not report the triggering incident to Starr until fifty-nine days after it learned of the chemical release. The holding in *Matador* clearly dictates that Starr was justified in denying coverage under the specific terms of the buy-back provision which the parties had negotiated to replace the original pollution exclusion. As in *Matador*, the plain language of the endorsement should be respected regardless of any prejudice suffered by Starr as a result of the late notice.

## B. *Matador* still tenable?

SGS apparently acknowledges the precedential impact of *Matador*, but argues that the opinion is "no longer tenable" and its reasoning is "deeply

No. 12-20545

flawed." It maintains that the Texas Supreme Court has now changed the law pertaining to notice requirements in insurance contracts, citing *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630 (Tex. 2008) and *Prodigy Communications Corp. v. Agricultural Excess & Surplus Ins. Co.*, 288 S.W.3d 374 (Tex. 2009). We disagree.

Neither *PAJ* nor *Prodigy* involved a specifically negotiated buy-back provision, such as the one involved in this case and in *Matador*. *PAJ* involved a commercial general liability policy that, among other things, required the insured to notify the insurance company of any claim brought against it "as soon as practicable." 243 S.W.3d at 631. While *PAJ* stated that Texas was beginning to follow a modern trend towards requiring proof of prejudice to the insurer before enforcing a notice provision in an insurance policy, the key finding in *PAJ* was that "the timely notice provision was not an essential part of the bargained-for exchange under [the insured's] occurrence-based policy." *Id.* at 636. As discussed above, *Matador* found that the notice provision in that case *was* an essential part of the bargained-for exchange because it was a specific provision negotiated by two sophisticated commercial parties in order to supplement the main insurance policy. *See* 174 F.3d at 659.

*Prodigy* extended this application of "fundamental principles of contract law" to claims-made policies. 288 S.W.3d at 378 (quoting *PAJ*, 243 S.W.3d at 633) (internal quotation marks omitted). There, a directors' and officers' liability insurance policy contained a provision that the insurer be given notice "as soon as practicable" of any claim made against the insured during the policy period, but in no event later than ninety days after the expiration of the policy. *See Prodigy*, 288 S.W.3d at 376. The insured failed to give notice of the claim "as

7

soon as practicable," but did give notice within ninety days of the policy's expiration date. *See id.* at 376-77. Following *PAJ*, *Prodigy* held that the failure to give timely notice did not defeat coverage so long as there was no prejudice to the insurer. *Id.* at 375. This holding was again based on an inquiry into whether the "as soon as practicable" language was "an essential part of the bargained-for exchange" under the policy. *Id.* The court concluded that it was not. *Id.*

It is clear then that *PAJ* and *Prodigy* do not disturb the holding in *Matador* since neither one reached any conclusion regarding notice requirements for this type of supplemental coverage. In fact, *PAJ* cited *Matador* approvingly to explain why a general notice requirement in an occurrence-based policy is not an essential part of the bargained-for exchange. *See* 243 S.W.3d at 636. In the instant case, as in *Matador*, we are dealing with a specific endorsement, separately negotiated by the parties, and with a clear notice requirement. Following an inquiry similar to the one outlined in *PAJ* and *Prodigy*, *Matador* concluded that a notice requirement in this type of supplemental pollution endorsement is essential to the bargained-for coverage. We remain bound by that precedent.

## C.  SGS's remaining arguments

SGS seeks to distinguish *Matador* because: (1) *Matador* involved a primary insurance policy, while Starr provided SGS with a bumbershoot policy; (2) the main policy in this case included a notice provision, Condition C, which provided that although notice of an occurrence likely to cause liability should be given "as soon as practicable," a failure to timely notify the insurer because the occurrence did not initially appear to involve the policy would not prejudice the

insured's claim; (3) Condition D of the policy, which did not require Starr to assume charge of the settlement or defense of any claim, indicated that the 30-day notice requirement at issue had no material purpose; and (4) the combination of Condition C and the pollution buy-back reporting requirement created an ambiguity regarding notice requirements, which must be resolved in favor of the insured.  We find these arguments unpersuasive.

We find no basis for applying a different rule to excess carriers when interpreting the meaning of a contractual provision and SGS cites no authority for that argument.  *See Berkley Reg'l Ins. Co. v. Phil. Indem. Ins. Co.*, 690 F.3d 342, 349 (5th Cir. 2012) (finding no basis for applying the notice-prejudice rule differently for excess carriers).  While Condition C was obviously considered an appropriate notice provision for the main policy, that policy excluded pollution coverage.  When the pollution endorsement was added, the parties specifically inserted a 30-day reporting requirement, which would necessarily trump the notice provision of the main policy.  Such an interpretation is consistent with Texas law.  *See Mesa Operating Co. v. Cal. Union Ins. Co.*, 986 S.W.2d 749, 754 (Tex. App. 1999) ("Endorsements to a policy generally supersede and control over conflicting printed terms within the main policy.").  Next, we find nothing in Condition D that diminishes or even affects the materiality of the 30-day notice requirement in the pollution buy-back provision.  Finally, an ambiguity only exists if the contractual language is susceptible to more than one reasonable interpretation.  *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).  We see no ambiguity as to which notice requirement applies to the pollution liability claims: the 30-day reporting requirement provided in the specifically negotiated pollution endorsement.

No. 12-20545

## IV.  CONCLUSION

For all the foregoing reasons, we AFFIRM.