# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————

No. 17-40148

———————

CONN CREDIT I, L.P.,

      Plaintiff - Appellee

v.

TF LOANCO III, L.L.C.,

      Defendant - Appellant

———————

Appeal from the United States District Court
for the Eastern District of Texas

———————

Before DAVIS, JONES, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Appellee Conn Credit I, L.P. sued Appellant TF LoanCo, III, LLC for breach of contract. TF Loan counterclaimed, also alleging breach. Following a bench trial, the district court ruled for Conn. We reverse, render judgment for TF Loan, and remand for calculation of damages.

I.

Conn Credit I, L.P., together with its parent company, sells furniture, appliances, and other goods to consumers on credit. When Conn's customers

United States Court of Appeals
Fifth Circuit

**FILED**

September 10, 2018

Lyle W. Cayce
Clerk

default, Conn charges off[1] the accounts and sells them to debt collectors for pennies on the dollar. In April 2014, TF LoanCo III, LLC entered into a Purchase and Sale Agreement to purchase a portfolio of charged-off loans from Conn.

The deal was divided into thirteen pieces—an initial "bulk sale" followed by twelve deliveries of Conn's future charged-off accounts, or "future flow." The purchase price was based on the balances of the accounts TF Loan bought. Depending on the account type, TF Loan agreed to pay between approximately 4.8% and 9.8% of the total remaining balances.

In the bulk sale, which closed on the day the parties entered into the Sale Agreement, TF Loan paid nearly $5 million for 43,367 accounts with total remaining balances just shy of $79 million. The Sale Agreement provided that the remaining twelve future-flow installments would be periodically delivered to TF Loan over the next year. On May 9, 2014, TF Loan received Delivery One and Delivery Two (a combined 10,412 accounts with total remaining balances of more than $20 million) and paid Conn approximately $1.5 million.

Deliveries Three, Four, Five, and Six, were scheduled to close on August 28, 2014. On August 23, Conn sued TF Loan for breach of contract, alleging that TF Loan had "declared through its agents and representatives that it w[ould] not fund the August 28, 2014 closing." TF Loan answered that it was not obligated to close on August 28 because Conn had breached the contract and failed to satisfy a condition precedent. TF Loan also asserted counterclaims for breach of contract and fraud. TF Loan has since abandoned its fraud claim and its defense of prior material breach.

---

[1] To "charge off" is to treat an account "as a loss or expense because payment is unlikely." Charge Off, Black's Law Dictionary (10th ed. 2014). A charged-off account, in other words, is "bad debt." *Id.*

No. 17-40148

A.

TF Loan's remaining defense and counterclaim center on Retail Service Agreements (RSAs) that Conn sells alongside its consumer products. RSAs are extended warranties that cover product replacement and repair. Although a Conn customer has the option of paying for a RSA upfront, many customers choose to finance the RSA together with the product. Of the 53,779 accounts TF Loan purchased in the bulk sale and Deliveries One and Two, 26,418 include a RSA bought on credit. When these 26,418 customers defaulted on their payments, Conn canceled the RSA—meaning the customer could no longer obtain benefits under the warranty. But, crucially, Conn did not credit the customer for the canceled portion of the RSA. In other words, Conn's customers remained on the hook for the full cost of the RSA, even after Conn canceled the RSA early for non-payment.[2]

TF Loan asserts that this practice violates Texas law. Chapter 1304 of the Texas Occupations Code governs "service contracts" like Conn's RSAs. Section 1304.159(c) states:

---

[2] Here's an example. Imagine Bob buys a washing machine from Conn for $600. He pays for a $300, three-year RSA and finances the entire purchase. Bob's contract with Conn explains that he will pay off the full $900 over three years, in equal monthly installments. After one year and $300 in total payments, Bob defaults on the loan. Conn promptly cancels the RSA and charges off Bob's account. But Conn does not credit Bob's account $200 for the two years of warranty coverage that Bob never got to enjoy. Conn then sells Bob's account to TF Loan. What is the remaining balance on Bob's account? Under Conn's practice, it is $600. Bob paid $300 on his $900 loan, and is not entitled to any RSA credit, so TF Loan can collect $600 from Bob. As explained below, however, TF Loan asserts that Texas law required Conn to credit Bob $200 for the two years of unrealized RSA benefits, such that the correct balance is actually $400.

3

No. 17-40148

> A service contract holder whose contract is canceled by the provider in accordance with this section is *entitled to a prorated refund of the purchase price* of the contract reflecting the remaining term of the contract, based on mileage, time, or another reasonably applicable measure of the remaining term that must be disclosed in the contract, decreased by the amount of any claims paid under the contract. (Emphasis added).

Relying on this language, TF Loan asserts that Conn's undisputed failure to credit charged-off accounts for canceled RSAs violates Section 1304.159(c).

B.

Whether Conn's servicing practices ran afoul of Section 1304.159(c)matters because, according to TF Loan, the parties made compliance with this and other applicable laws a condition precedent to TF Loan's purchase.[3] In the parties' Sale Agreement, Conn made several "Representations and Warranties." Two are relevant to this appeal. In Section 8.3 of the Sale Agreement, Conn "represent[ed], warrant[ed], and covenant[ed]" that "[t]he execution and delivery of this Agreement and the performance of its obligations hereunder by Seller [Conn] will not conflict with any provision of any law or regulation to which Seller is subject . . . ." In Section 8.5 of the Sale Agreement, Conn similarly represented, warranted, and covenanted that "[t]he Accounts have been originated, serviced, and collected in accordance with all applicable laws."[4]

---

[3] TF Loan also argues that Conn's failure to credit charged-off RSAs violates Conn's contracts with its customers. Because we hold that Conn's breach of contract claim fails based on its failure to comply with Section 1304.159(c), we need not examine the effect of these third-party contracts.

[4] Conn asserts that TF Loan forfeited reliance on Section 8.5 before this court. In fact, TF Loan's brief quoted the section in full and argued that "Conn's failure to make . . . refunds constituted a breach of its representations and warranties contained in Sections 8.3 and 8.5 of the PSA."

No. 17-40148

These warranties are incorporated as "Conditions Precedent to Purchase or Sale of Accounts" in Section 10.2 of the Sale Agreement. That section states in relevant part:

> The Seller [Conn] and the Buyer [TF Loan] will be obligated to transfer Accounts on a Closing Date only if . . . the representations and warranties of the Buyer or the Seller, respectively, in this agreement are true and correct as of such Closing Date . . . .

Finally, Section 9.4 of the Sale Agreement governs TF Loan's remedies if Conn has breached its representations and warranties. Section 9.4 states:

> Except for the indemnification remedies provided herein, Buyer [TF Loan] and Seller [Conn] agree that, as to any breach by Seller of any of its representations or warranties in respect to any Account, Buyer's sole and exclusive remedy for damages other than third party claims arising out of such breach shall be the Seller's repurchase of such Account. (Emphasis omitted).

Adding these provisions up, TF Loan argues that it did not breach the Sale Agreement when it refused to close on Deliveries Three, Four, Five, and Six because:

*First*, Section 10.2 of the Sale Agreement imposed as a condition precedent that TF Loan was obligated to close only if Conn's representations were "true and correct" as of the closing date;

*Second*, in Sections 8.3 and 8.5 of the Sale Agreement, Conn represented that the sale would not "conflict with any provision of any law or regulation to which [Conn] is subject" and that "[t]he Accounts have been originated, serviced, and collected in accordance with all applicable laws"; and

*Third*, Conn's representations were false because Conn did not credit its customers' accounts with the "prorated refund" required by Section 1304.159(c) of the Texas Occupations Code.

Similarly, in its single live counterclaim, TF Loan argues that:

5

*First*, Conn breached its warranties in Sections 8.3 and 8.5 as to any customer account with an unrefunded RSA that TF Loan purchased in the Bulk Sale or Deliveries One and Two; and

*Second*, under Section 9.4, TF Loan's remedy for this breach is repurchase of these accounts.

C.

Following a three-day bench trial, the district court entered its Findings of Fact and Conclusions of Law. The court began with the undisputed conclusion that TF Loan refused to close on Deliveries Three, Four, Five, and Six. It then considered TF Loan's condition precedent argument and held that Conn's failure to refund RSAs bought on credit did not violate Section 1304.159(c) because the statute requires a "prorated refund of the *purchase price*" of a canceled service contract. This language, to the district court, implied that "[i]f the customer did not pay any amount up-front for . . . the RSA, the customer should not be entitled to a refund, because there was no 'purchase price' that was actually paid."

The district court further concluded that, even if Conn's failure to issue pro-rata RSA refunds rendered Section 10.2's condition precedent unfulfilled, TF Loan could not show prejudice or that the representations and warranties in Section 10.2 were "an essential part of the bargained-for exchange." Finally, the Court held that Conn had implicitly waived any right to enforce the condition precedent in Section 10.2 by collecting on some accounts with unrefunded RSAs. Pursuant to the parties' damages stipulation, the court entered a $356,706.93 judgment for Conn, plus attorneys' fees, costs, and interest.

No. 17-40148

## II.

When reviewing a bench trial, we test the district court's findings of fact for clear error and its legal conclusions de novo. *Steele v. Leasing Enters. Ltd.*, 826 F.3d 237, 242 (5th Cir. 2016). The parties do not dispute the district court's conclusion that Texas law governs this case. In Texas, interpretation of an unambiguous contract is a question of law. *Ergon-W. Va., Inc. v. Dynegy Mktg. & Trade*, 706 F.3d 419, 424 (5th Cir. 2013). And whether a contract contains an ambiguity is itself a question of law. *Id.*

## III.

We begin with Conn's breach of contract claim against TF Loan. Under Texas law, "[t]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Intern., Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.,* 51 S.W.3d 345, 351 (Tex. App.—Hous. [1st Dist.] 2001, no pet.)). Neither party disputes that the Sale Agreement is a valid contract, that TF Loan materially failed to perform by refusing to close on Deliveries Three through Six, or that Conn suffered damages as a result. The only question is whether Conn has proved its compliance with all conditions precedent such that TF Loan's failure to perform constituted breach.

## A.

TF Loan argues that Conn cannot recover on the Sale Agreement and that it was discharged from further performance because Conn breached a warranty term that was a condition precedent to TF Loan's further obligations. A condition precedent is "an event that must happen or be performed before a right can accrue to enforce an obligation." *Associated Indem. Corp.*, 964 S.W.2d

No. 17-40148

at 283 (quoting *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992)). "In order to determine whether a condition precedent exists, the intention of the parties must be ascertained; and that can be done only by looking at the entire contract. In order to make performance specifically conditional, a term such as 'if', 'provided that', 'on condition that', or some similar phrase of conditional language must normally be included." *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 109 (Tex. 2010) (citations omitted).

Under Section 10.2 of the Sale Agreement—titled "Conditions Precedent to Purchase or Sale of Accounts"—TF Loan was "obligated to transfer Accounts on a Closing Date *only if* . . . the representations and warranties of the Buyer or the Seller, respectively, in this Agreement are true and correct as of such Closing Date" (emphasis added). This is an unambiguous condition precedent. Accordingly, if Conn's representations and warranties in the Sale Agreement were not true and correct as of August 28, 2014, Conn cannot enforce TF Loan's obligation to close on Deliveries Three, Four, Five and Six.

B.

Conn's representations and warranties in Section 8.5 of the Sale Agreement were false because Conn's failure to refund canceled RSA accounts violated Texas law. Section 1304.159(c) of the Texas Occupations Code provides that: (1) a "service contract holder" (2) "whose contract is canceled by the provider in accordance with this section" (3) "is entitled to a prorated refund of the purchase price of the contract." Conn does not dispute that Conn's RSAs are "service contracts" and Conn is the "provider" of those contracts. The district court held, however, that Section 1304.159(c) does not apply to the RSAs at issue in this case because these RSAs were bought on credit, and, in the district court's view, a "purchase price" does not include a financed price.

8

The district court concluded, in other words, that a product bought entirely on credit has a "purchase price" of zero.

"When we interpret a Texas statute, we follow the same rules of construction that a Texas court would apply—and under Texas law the starting point of our analysis is the plain language of the statute." *Forte v. Wal-Mart Stores, Inc.*, 780 F.3d 272, 277 (5th Cir. 2015) (quoting *Wright v. Ford Motor Co.*, 508 F.3d 263, 269 (5th Cir. 2007)); *see also City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 641 (Tex. 2013) ("[W]e look first to the 'plain and common meaning of the statute's words.'" (quoting *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002))).

The district court's construction of the term "purchase price" is inconsistent with its plain and common meaning. Black's Law Dictionary defines purchase price as "[t]he price actually paid for something, esp[ecially] a house." Price, Black's Law Dictionary (10th ed. 2014). Miriam-Webster agrees.[5] Nothing about these definitions suggests a distinction between credit and cash purchases. Further, Texas cases routinely use "purchase price" to describe purchases on credit. *See, e.g., Moehring v. Myers*, No. 01-09-00204-CV, 2010 WL 2431086 at *1 (Tex. App.—Hous. [1st Dist.] June 17, 2010, no pet.) ("The purchase price was $90,000 and was financed [by the seller of the property]").[6] The district court therefore erred in holding that Section 1304.159(c)'s refund requirement does not apply; the statute requires Conn to

---

[5] *Definition of Purchase Price*, Merriam-Webster (Feb. 20 2018, 11:05 AM), http://www.merriam-webster.com/dictionary/purchase%20price ("the amount of money someone pays for something (such as a house)").

[6] It is also notable that Section 1304.159 itself contemplates that service accounts are sold on credit. The section states that a service contract provider "is not required to provide prior notice of cancelation if the service contract is canceled because of . . . nonpayment of the consideration for the contract." Tex. Occ. Code § 1304.159(b). Yet the statue does not suggest that refunds are unavailable for these cancelations.

provide a prorated refund to a customer's account when Conn cancels a RSA purchased on credit.[7]

Conn's failure to refund canceled RSA accounts rendered its representations and warranties untrue. In Section 8.5 of the Sale Agreement, Conn warranted that the accounts had "been originated, serviced, and collected in accordance with all applicable laws." To service a loan is "to collect payments and maintain a payment schedule."[8] As explained, Section 1304.159(c) requires Conn to refund canceled RSA accounts. By maintaining account balances that did not reflect the required refund, Conn failed to service RSA accounts in accordance with applicable law. Accordingly, Conn did not satisfy the condition precedent in Section 10.2, and its claim for breach of contract fails.[9] *See Mullins*, 564 F.3d at 413.

## C.

In finding for Conn on its breach of contract claim, the district court held, in the alternative, that "[e]ven if a party fails to satisfy a condition precedent, a court must examine whether the condition precedent was 'an essential part of the bargained-for exchange' and also whether there was prejudice to the party claiming the affirmative defense." The district court then held that Section 10.2 was not essential and TF Loan was not prejudiced, so—even if

---

[7] Conn argues that reading Section 1304.159 to require refunds of RSAs purchased on credit would result in a "windfall" to its customers. This assumes that customers—even those who finance their RSAs—are entitled to a cash refund rather than a credit to their outstanding account. Conn offers no support for this strained reading, and it contradicts one of Conn's own contracts, which states that "all *refunds* due under the [RSA] policy will be *credited* to the account." (emphasis added). Further, adopting Conn's reading does not eliminate the windfall, it just shifts it to Conn.

[8] *Definition of Service*, Merriam-Webster (Feb. 20 2018, 2:03 PM), https://www.merriam-webster.com/dictionary/service.

[9] Because we find that Conn breached Section 8.5, we need not decide whether it also breached Section 8.3.

Conn failed to satisfy Section 10.2—TF Loan was not excused from performing under the Sale Agreement.

We conclude that imposing a prejudice requirement was error under Texas law. "Where, as here, the proper resolution of the case turns on the interpretation of Texas law, we are bound to apply Texas law as interpreted by the state's highest court." *Boren v. U.S. Nat. Bank Ass'n*, 807 F.3d 99, 104–05 (5th Cir. 2015) (quoting *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 564 (5th Cir. 2010)). On issues the Texas Supreme Court has not yet decided, "we must make an '*Erie* guess' as to how the Court would resolve [the] issue." *Id* (quoting *Am. Int'l Specialty Lines Ins. Co.*, 620 F.3d at 564).

Conditions precedent are generally not favored under Texas law, *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990).  But if, as here, a legitimate condition precedent exists, it must be either met or excused before the obligation that hinges on the condition may be enforced.  *Arbor Windsor Court, Ltd. v. Weekley Homes, LP*, 463 S.W.3d 131, 135 (Tex. App. 2015) (citing *Hohenberg Bros. Co., v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976).  Texas courts may excuse the performance of a condition precedent, however, only if "the condition's requirement '(a) will involve extreme forfeiture or penalty, and (b) its existence or occurrence forms no essential part of the exchange for the promisor's performance.'" *S. Tex. Elec. Co-op v. Dresser-Rand Co.*, 575 F.3d 504, 509 (5th Cir. 2009) (quoting *Varel v. Banc One Capital Partners, Inc.*, 55 F.3d 1016, 1018 (5th Cir. 1995)).

There has been no showing here that Section 10.2 creates an extreme forfeiture or penalty, and the Sale Agreement makes clear that it was a material condition of performance. The district court derived a prejudice requirement from a line of Texas Supreme Court cases holding that "an insured's failure to timely notify its insurer of a claim or suit does not defeat

11

coverage if the insurer was not prejudiced by the delay." *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 636–37 (Tex. 2008); *see also Prodigy Communications Corp. v. Agricultural Excess & Surplus Insurance Co.*, 288 S.W.3d 374, 375 (Tex. 2009). But Conn does not identify a single Texas case applying a prejudice requirement outside of the insurance context. Forced to make an *Erie* guess, we conclude that Texas courts would not. *See also Starr Indem. & Liab. Co. v. SGS Petroleum Serv. Corp.*, 719 F.3d 700, 702–04 (5th Cir. 2013) (holding under Texas law that insurer need not show prejudice before denying coverage for late notice under pollution "buy-back" provision); *Gandy v. Burton*, No. 12-cv-1883, 2013 WL 2902786, at *3 (S.D. Tex. June 13, 2013) (holding under Texas law that prejudice requirement did not apply to condition precedent in non-insurance contract). Accordingly, to defeat Conn's breach of contract claim, TF Loan need not show that it was prejudiced by Conn's failure to satisfy the Section 10.2 condition precedent.

Unable to derive a materiality requirement in Texas law, Conn attempts to import one into Section 10.2 from elsewhere in the Sale Agreement. First, Conn points to Section 10.2's second clause:

> The Seller [Conn] and the Buyer [TF Loan] will be obligated to transfer Accounts on a Closing Date only if (i) the representations and warranties of the Buyer or the Seller, respectively, in this agreement are true and correct as of such Closing Date; *and (ii) the Buyer or the Seller, respectively, has complied in all material respects with any obligation to be performed by it on or prior to such Closing Date.* (Emphasis added).

To the extent Conn argues only one of the two Section 10.2 conditions must be satisfied to obligate account transfer, Conn misreads the contract. The two prongs are separated by an "and," not an "or." *See United States v. Correa-Ventura*, 6 F.3d 1070, 1076 (5th Cir. 1993) ("[T]hese conditions are worded in the conjunctive; in other words, all three prongs of the test must be met."). To

12

the extent Conn argues that we should read a materiality requirement into the first Section 10.2 condition in isolation, Conn asks us to ignore the term's absence, and therefore "the express language of [the] agreement." *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014). We have no power to manufacture a materiality requirement from otherwise-silent text.

Conn also raises Section 10.3 of the Sale Agreement, which concerns "termination":

> **Termination.** This Agreement may be terminated . . . by a Party, if there has been a *material violation or breach* by the other Party of any covenant, *representation or warranty* contained in this Agreement.

But Conn points to no evidence that TF Loan "terminated" the agreement, as opposed to merely refusing to transfer accounts on the August 28 closing date. To the contrary, Conn's amended complaint alleges only that "TF Loan has declared through its agents and representatives that it will not fund the August 28, 2014 closing in respect of the August Deliveries." Accordingly, Conn fails to show that anything in the Sale Agreement imposes a materiality requirement on the Section 10.2 condition.

## D.

The district court also held that TF Loan waived the condition precedent in Section 10.2 because it continued to collect on some accounts with uncredited RSA terms. These collection attempts, to the district court, were "'intentional conduct inconsistent' with claiming [TF Loan's] right to the condition precedent set forth in Section 10.2."

The district court's waiver discussion omits a key consideration: the explicit nonwaiver provision of the Sale Agreement. Section 13.4 of the agreement reads:

> The rights of each of the parties hereunder shall not be capable of being waived or varied other than by an express waiver or

variation in writing. Any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right. Any defective or partial exercise of any such rights shall not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

"Given Texas's strong public policy favoring freedom of contract, there can be no doubt that, as a general proposition, nonwaiver provisions are binding and enforceable." *Shields L.P. v. Bradberry*, 526 S.W.3d 471, 481 (Tex. 2017). Because Conn points to no evidence that TF Loan waived its rights under Section 10.2 expressly in writing, the relevant question is whether the nonwaiver provision itself was waived. *Id.* at 485–86. To find waiver of a nonwaiver provision, "there must, at a minimum, be some act inconsistent with its terms." *Id.* at 474. Conn does not suggest that TF Loan acted "inconsistent with claiming the right to enforce the nonwaiver agreement." *Id.* at 485. Nor does Conn argue that the Sale Agreement contains the sort of "nonwaiver provision absolutely barring waiver in the most general of terms" that the Texas Supreme Court recognized "might be wholly ineffective." *Id.* at 484. Accordingly, Conn has not shown that TF Loan waived the condition precedent in Section 10.2. *See Page v. JP Morgan Chase Bank, N.A.*, 605 F. App'x 272, 276 (5th Cir. 2015) (under Texas law, nonwaiver provisions "create[d] a presumption" that party did not intend to relinquish its rights).

E.

Conn presents several additional arguments to resist the conclusion that TF Loan was excused from purchasing Deliveries Three, Four, Five, and Six under Section 10.2. None is persuasive.

First, Conn cites evidence suggesting that TF Loan was an "unsophisticated purchaser" and that TF Loan did not perform due diligence

on the accounts it purchased. But Conn fails to connect this factual assertion to a legal theory. Conn has never argued, here or in the district court, that the Sale Agreement is ambiguous. And the district court concluded that it is not. Accordingly, we enforce the contract as written, without regard to any party's level of sophistication. *See Horn v. State Farm Lloyds*, 703 F.3d 735, 738 (5th Cir. 2012) ("If a contract is unambiguous, we apply its plain meaning and enforce it as written.").

Next, Conn argues that TF Loan "does not have standing" to "enforce" Section 1304.159(c). This argument also misses the mark. TF Loan is not seeking to enforce any law. It is invoking a condition precedent in its contract with Conn, which predicates performance on Conn's compliance with applicable laws, including Section 1304.159(c).

Finally, Conn suggests that any disagreement about account balances should be resolved under Section 2.7, another provision of the Sale Agreement. But that provision applies when "payments . . . received by Seller . . . are not reflected in the related Account Balance" or payments credited to the account are "subsequently dishonored." Conn does not explain how this language could cover a failure to reduce balances on accounts with canceled RSAs.

IV.

Finally, we consider TF Loan's counterclaim for breach of contract. As explained above, Conn breached the representations and warranties it made in the Sale Agreement. TF Loan asserts that under the terms of the Sale Agreement, Conn is required to buy back all accounts affected by this breach that TF Loan bought in the Bulk Sale and Deliveries One and Two.

In Texas, "contracting parties are free to specify in an agreement how damages will be calculated in the event of a breach." *Gilbert Wheeler, Inc. v.*

No. 17-40148

*Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474, 479 (Tex. 2014). Here, the parties did just that:

> **Section 9.4. <u>Repurchase of Accounts as Exclusive Remedy.</u>** Except for the indemnification remedies provided herein, Buyer [TF Loan] and Seller [Conn] agree that, as to any breach by Seller of any of its representations or warranties in respect to any Account, Buyer's sole and exclusive remedy for damages other than third party claims arising out of such breach shall be Seller's repurchase of such Account.

To escape this clear language, Conn argues that Section 9.4 "incorporates" a materiality requirement from some of the representations and warranties it references.[10] It cites materiality language in Sections 8.7 and 8.9, which contain warranties and representations regarding a computer file and account documents. These warranties, however, are not the ones that Conn breached. Conn's conclusory argument that they modify the clear language of Section 9.4 is unavailing.

Conn also suggests that it is "customary in the industry" for a seller to adjust the balance of an inaccurate account rather than repurchase it. But Conn's resort to parol evidence cannot disturb the clear language of the contract. *See Horn*, 703 F.3d at 738 ("If a contract is ambiguous, then, and only then, do we consider extrinsic evidence for 'the purpose of ascertaining the true intentions of the parties expressed in the contract.'") (applying Texas law and quoting *Am. Tobacco Co.*, 463 F.3d at 407)).

Conn's failure to refund its customers for expired RSA terms violated Section 1304.159(c). By violating Texas law, Conn rendered its warranties and representations in Section 8.5 of the Sale Agreement false. Under Section 9.4

---

[10] Conn must look to the contract for a materiality requirement because, although an immaterial breach does not excuse future performance, it will still support a suit for damages. *Pelco Constr. Co. v. Chambers County*, 495 S.W.3d 514, 523 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

of the Sale Agreement, Conn agreed to repurchase any account subject to a breached representation or warranty. TF Loan is therefore entitled to repurchase of accounts in the Bulk Sale and Deliveries One and Two with canceled RSAs.

## V.

The district court's judgment is REVERSED. Entry of judgment in favor of TF Loan on Conn's breach of contract claim and in favor of TF Loan on TF Loan's breach of contract counterclaim is RENDERED. The case is REMANDED for determination of damages pursuant to the parties' stipulation, as well as any other appropriate matters.